Filed 9/14/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| GEORGE DIEGO et al., | B268266 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC496533) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County.  Gregory Wilson Alarcon, Judge.  Reversed with directions.

Michael N. Feuer, City Attorney, James P. Clark, Chief Deputy City Attorney, Thomas H. Peters, Chief Assistant City Attorney, Blithe S. Bock, Managing Assistant City Attorney, and Juliann Anderson, Deputy City Attorney, for Defendant and Appellant.

Law Offices of Gregory W. Smith, Gregory W. Smith; Law Offices of Marla A. Brown, Marla A. Brown; Benedon & Serlin, Douglas G. Benedon and Judith E. Posner for Plaintiffs and Respondents.

The City of Los Angeles (the City) appeals from a judgment against it following a jury trial in a discrimination action brought by two officers of the Los Angeles Police Department (LAPD or the Department).  The two officers, George Diego and Allan Corrales (the Officers), respondents in this appeal, are both Hispanic.  They claim that they suffered discrimination within the Department following their involvement in a fatal shooting in March 2010.  In that incident, the Officers fired at a person they believed was threatening them with a gun, but who turned out to be a young, unarmed African-American man who was later described by his family as autistic.  The shot fired by Corrales killed the man.  The Officers claimed that they were unfairly kept out of the field (colloquially described as "benched") after the incident, resulting in lost promotional opportunities and off-duty work, because of their race.  They also claimed that the City retaliated against them because they filed this lawsuit.

The jury found in favor of the Officers and awarded cumulative damages of almost $4 million.  The City argues on appeal that the evidence is not sufficient to support the verdict, and that the trial court therefore should have granted its motion for a directed verdict.

We agree and reverse.  The fundamental problem with the Officers' claims is that they were based on an improper legal theory.  While the evidence that the Officers produced at trial might have been sufficient to support the theory of discrimination that they presented, that theory was legally flawed.  The Officers claimed that they suffered disparate treatment because they are Hispanic and the victim was African-American.  They relied on evidence of another shooting incident involving a Caucasian officer and a Hispanic victim, after which the officer involved was

returned to field duty. Thus, the Officers' theory was that the jury could and should consider whether the Officers were treated differently, not simply because of their race, but because of the race of their *victim*.

This theory does not support the discrimination claim that the Officers brought. In deciding whether to return the Officers to the field, the City could assess the political implications of doing so without violating employment discrimination laws. Those laws would not permit the City to treat the Officers differently because they are Hispanic, but they did not prohibit the City from assessing the risk management implications of returning officers of *any* race to the streets of Los Angeles who had been involved in a fatal shooting of an innocent, unarmed and autistic African-American man. The Officers claimed that African-American officers would have been treated differently, but they did not introduce any competent evidence to support that claim.

They also did not provide evidence sufficient to support their claim that the City retaliated against them for filing this lawsuit. Nothing about their status changed after they filed their complaint. Nor did they provide any evidence that the lawsuit was a motivating factor in the decision to continue withholding their field certification. Indeed, both Officers testified that they filed this suit as a last resort after concluding that they were unlikely to be restored to the field.

We are reluctant to overturn a jury verdict and are of course cognizant of the high standard the City must meet on appeal to show that the evidence was insufficient to support that verdict. However, as explained further below, the jury here did not have a complete picture of the governing law. The jury was

3

correctly told that it must find that the Officers' race was a "substantial motivating reason" for the "adverse employment actions" that they experienced. But the jurors were not given any instruction about whether and how they should consider the race of the victim in making this assessment. The absence of such an instruction permitted the Officers to argue that *any* decision by the City based on race—including the race of the victim—was sufficient to support a verdict in their favor. That argument was inconsistent with the law.

The record does not show that the parties requested any specific instruction on this point, and the City has not raised instructional error as a ground for appeal. However, the City did argue in its motion for a directed verdict that a discrimination claim could not be properly based upon the City's consideration of the race of the victim. We conclude that the City's motion should have been granted.

The Officers believe, and apparently the jury agreed, that they were treated unfairly as a result of broader political concerns. But alleged unfair treatment in the workplace does not amount to an actionable discrimination claim unless the treatment is based upon the employee's race or other protected status. The Officers failed to prove such disparate treatment and failed to show unlawful retaliation. We therefore reverse and remand with instructions to enter judgment in favor of the City.

## BACKGROUND

### 1. *The Shooting Incident*

In 2010 the Officers were members of the Gang Enforcement Unit in LAPD's Olympic Station. They had received excellent performance reviews.

4

Close to midnight on March 19, 2010, the Officers were driving south on Vermont Avenue.  While turning left on James M. Wood Avenue to get a cup of coffee, the Officers heard a noise like a "bang" from a direction north of them.  The noise did not sound like a gunshot, but like someone "slammed something." Diego, who was driving, turned back up Vermont, proceeding north, when the Officers saw a man wearing a hoodie walking north.  The Officers drove up close to the man (later identified as 27-year-old Steve Washington).  Corrales said something like, "Hey, how you doing," or, "Hey, are you ok."

Washington turned and looked at the Officers with a "mad look."  Corrales saw Washington "ruffling his waistband" and thought he was arming himself.  Corrales said, "Waistband, waistband," and drew his weapon.

Washington turned and spun toward the Officers. Surveillance video from a nearby business showed Washington turning rapidly and making some kind of throwing motion toward the Officers.  Corrales believed that he was going to be shot, and therefore fired his weapon.

Diego jumped out of the car when he saw Washington turn and was frightened to the point that he forgot to put the car in park.  As he was jumping out of the car he heard Corrales say, "Gun, gun."  While spinning out of the car, he heard a gunshot and thought that Corrales had been shot.  He saw that the car had moved forward and did not see Corrales, who was still in the car.  Diego fired at Washington and missed.

Corrales's shot hit Washington in the head and killed him. The Officers later found out that Washington was not armed. Washington had a black cell phone case clipped to his waist.

Washington's mother later told the area captain for the Olympic Station, Matthew Blake, that Washington was autistic.

## 2. *The Investigation Process*

The City follows a standard procedure after an officer involved shooting. Within 72 hours, the chief of police receives an executive summary to get an initial assessment of the shooting and to decide whether the officer(s) should be returned to the field.

After the 72-hour review, the next step in the review process is an exhaustive investigation by LAPD's "Force Investigation Division" (FID). The FID provides a report to the LAPD "Use of Force Review Board" (Board) and to the chief. Based upon that report and his own analysis, the chief provides a recommendation to the "Police Commission" (Commission).

The "Office of the Inspector General" (OIG) oversees the FID investigation and makes its own, independent recommendations to the Commission. The OIG is not an LAPD organization. It was originally formed as a result of recommendations by the Christopher Commission in the wake of the Los Angeles unrest following the Rodney King incident in 1991. The OIG reports directly to the Commission.

The Commission determines whether a shooting was "in policy" or "out of policy." In 2010, officer involved shootings were evaluated in three separate, but related areas: (1) tactics; (2) drawing and exhibiting the weapon; and (3) actual use of force. The Commission makes the final determination as to whether a shooting was in or out of policy, and that determination is binding on the Department.[1] However, the

---

[1] The Commission's meetings to review officer involved shootings are not public due to police officers' confidentiality

6

Commission does not have the right to direct any punishment or to decide whether an officer should be taken out of the field. The police chief retains the final authority over discipline.

**3.** ***Investigation and Decisions Concerning the Officers' Shooting***

As Diego's and Corrales's commanding officer, Blake presented the 72-hour summary to Police Chief Charles Beck concerning the Officers' shooting. Blake recommended that the Officers remain out of the field for no more than a couple of weeks. He wanted to be sure they would be safe when they returned to the field. He also had a concern "that it was a very sympathetic type of shooting, because the suspect at the time— suspect/victim situation, he was autistic."

Chief Beck concurred with the decision to keep the Officers out of the field. Although in the majority of cases officers involved in shootings return to the field after the 72-hour review, this shooting concerned Chief Beck because it was a "perception shooting" of an "unarmed innocent individual."

Following the 72-hour briefing, the FID conducted an investigation and prepared a report. The Board met on January 10, 2011, to consider what recommendations to make based upon the results of the investigation. Blake presented recommendations to the Board, which was composed of four command-level officers and a "peer" officer.

Blake recommended that the officers receive an administrative disapproval for their tactics. Blake's recommendation was based on the conclusion that the Officers'

---

rights. After it makes a determination, the Commission presents the results in an open session the same day.

tactics were "egregious" because "they put them in a position to where they were so close next to that person who they believed to be a suspect, that it wouldn't give them any time to be able to respond, to get cover, to get concealment or any of those things." However, Blake concluded that both Officers' decisions to exhibit their firearms and to use lethal force were "in policy" because, "although the tactics were bad, which, in my mind, led up to the shooting, they were in a position where it was life or death in their minds."[2]

The Board adopted Blake's recommendations. The Board recommended administrative disapproval for the Officers' tactics, but found their exhibiting of their weapons and their use of force to be in policy.

Chief Beck agreed with the Board's recommendations. He sent a report to the Commission discussing his conclusions that the Officers' exhibiting of weapons and use of force were both in policy. The report stated Chief Beck's determination that the Officers "had an objectively reasonable belief that they were in imminent threat of serious bodily injury or death, and any officer with similar training and experience under the same or similar facts and circumstances would have the same belief." With respect to tactics, he found that "the tactics utilized by Officers Diego and Corrales *substantially and unjustifiably deviated from*

---

[2] During closing arguments, the City conceded that "[t]here is no doubt that these officers feared for their life when Mr. Washington turned and moved towards them. They had no choice but to shoot, because Officer Corrales feared for his life. There's no doubt about that." The City argued only that the Officers' tactics were poor and had put the Officers "in a position where they had to kill an innocent man."

8

*approved Department tactical training,* requiring a finding of Administrative Disapproval."  The OIG agreed with Chief Beck's recommendations.

After confidential meetings on February 15 and March 1, 2011, the Commission issued findings that adopted Chief Beck's conclusions with respect to tactics but rejected his findings concerning the exhibiting of weapons and use of force.  The Commission concluded that both Officers' use of force was out of policy, and that Corrales's decision to draw his weapon was out of policy.

Based upon the Commission's determination, Blake recommended an official reprimand for Diego and a conditional reprimand for Corrales, which are among the lowest forms of punishment within the LAPD.  Chief Beck concurred.  Chief Beck also decided not to send the Officers back into the field.

### 4.    *The Officers' Subsequent Employment*

After the incident, the Officers were assigned to various jobs that did not require a field certification.  They continued to receive their full salary, less a 2 or 3 percent "patrol bonus."  They were both assigned for a time to the Community Relations Office, where they worked with youth programs.  They continued to carry their weapons, including while monitoring LAPD carnivals where gang members were present, but were not returned to the field.

In about June or July of 2012 Diego obtained a position as a "P-II" with the "Use of Force Review Division."[3]  Diego applied unsuccessfully for six or seven P-III positions in 2012.  One of

---

[3] P-II is the rank of a "regular" police officer.  P-III is the level above, classified as a "training officer."  The Officers were both ranked P-II at the time of the incident.

9

those positions in the Use of Force Review Division did not require field certification. He was told that his captain and Assistant Chief Sandy Jo MacArthur had approved the position, but that it had been denied by Deputy Chief Jacobs and Chief Beck because "they didn't want it to be perceived wrong, according to them, that I was being rewarded a P-III position, where—we deal with the Police Commission. So they didn't want it to look like I was being rewarded, I guess."

Diego also applied for a position as a tactical flight officer. However, one of the criteria was recent field experience, so he was at a disadvantage. He did not get the position.

Corrales applied for only one P-III position, which he did not obtain. He testified that he did not apply for more because, "I saw my partner, Officer Diego, taking several spots and kept getting denied and denied and denied."

Diego and Corrales also applied unsuccessfully for permission to work in an off-duty job for the Dodgers. The job required officers to wear an LAPD uniform and carry a gun. Corrales was told that permission was denied because he was not field certified. Corrales also attempted to obtain permission for other outside jobs, but they also required him to carry a gun.

The Officers continued to receive favorable performance reviews after the shooting incident. Other officers, including sergeants, asked Blake when the Officers would be back in the field, leading Blake to observe that "there's a lot of people who wanted to see these two guys go back to the field." A sergeant who maintained a list of officers who were not field certified after a use of force proceeding testified that he had never known an officer who had not returned to the field for five years after an out of policy shooting.

10

## 5.     *The Bua Shooting Incident*

Officer Shane Bua was a P-III in the gang unit at the Olympic Station in 2010.  He is White.  On August 28, 2010, he was involved in the fatal shooting of a Hispanic person.

While he was on patrol with his partner, they heard a radio broadcast about an assault with a deadly weapon in progress.  There was a report that someone with a bat was trying to pull a family out of a car at an intersection.  There had been a gang shooting the night before nearby, and the officers had been informed that there was a feud between a Hispanic gang and a Black gang in the area.

The report was updated before the officers arrived at the scene, informing them that the suspect was armed with a gun.  The officers arrived at the scene on Washington Boulevard and saw the suspect about 60 or 65 feet away.  They saw a man in the driver's seat in a car and the suspect was "hitting the window with an object and pulling on the door, trying to break the window and open the driver side door."  Bua ran up into the intersection and was "pretty certain" he saw a gun in the suspect's hand.  He shot at the suspect because he believed persons in the car were about to be shot.  The suspect actually had a small bat in his hand rather than a gun.

The Commission found that Bua's shooting was out of policy, but he returned to the field after about six weeks.

## 6.     *The Jacobs Meeting*

On May 17, 2012, Diego and Corrales met with Deputy Chief Jacobs to discuss the reasons why they still had not been returned to the field.  According to Diego, Jacobs said that they were still benched because "it was political and we had shot an unarmed male Black."  He also mentioned that the person was

11

autistic.  Diego's understanding of the reference to "political" was that "it was a race thing," meaning it was "an African American male."

Diego asked Jacobs why Bua had returned to the field when the Officers had not.  Jacobs told them it was "because yours is political and you shot an unarmed male Black."

After the meeting, the Officers concluded that their benching was not temporary and therefore decided to seek legal help.

**7.      *Proceedings Below***

The Officers filed their complaint on November 30, 2012.  The case went to trial on March 3, 2015.  At the conclusion of evidence on March 16, 2015, the City made an oral motion for a directed verdict.  Although the trial court did not formally deny the motion, the court permitted the case to go to the jury.

The jury returned a special verdict on March 19, 2015, finding in favor of the Officers.  The jury found that the Officers' race was a "substantial motivating reason for the City . . . to subject [them] to one or more adverse employment actions."  The jury also found that the filing of the lawsuit was a substantial motivating reason for the adverse employment actions, and that the Officers' "poor tactics" was not.  The jury awarded damages in the amount of $2,085,000 to Corrales and $1,914,500 to Diego.

**DISCUSSION**

**1.      *Standard of Review***

Reversal of the denial of a motion for directed verdict is proper only if there is no substantial evidence to support the plaintiff's claim.  (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 263 (*Adams*).)  When the trial court denies a directed verdict motion and the jury finds in the plaintiff's favor,

an appellate court's review is "functionally equivalent" to reviewing whether there was substantial evidence to support the verdict. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.)

In reviewing for substantial evidence, we must evaluate the entire record, interpreting the evidence in the light most favorable to the Officers and drawing all reasonable inferences in their favor. (*Adams, supra,* 68 Cal.App.4th at p. 263; *Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 816 (*Frank*).) However, substantial evidence is not synonymous with *any* evidence. (*Frank*, at p. 816.) An inference may not be based on speculation or surmise. (*Id.* at pp. 816–817.) An inference also may not stand if it is unreasonable in light of the whole record, or if it is rebutted by " 'clear, positive and uncontradicted evidence' " that is not subject to any reasonable doubt. (*Id.* at p. 817, quoting *McRae v. Department of Corrections and Rehabilitation* (2006) 142 Cal.App.4th 377, 389 (*McRae*).)

## 2. *The Evidence Was Insufficient to Support a Verdict of Discrimination*

### a. *The law governing proof of discrimination claims*

Government Code section 12940, subdivision (a) provides that it is an unlawful employment practice for an employer, "because of the race . . . of any person, to . . . discriminate against the person in compensation or in terms, conditions, or privileges of employment."[4] Particular burden-shifting rules apply to proof of a discrimination claim under this section, which "reflects the

---

[4] Subsequent undesignated statutory references are to the Government Code, in particular, the California Fair Employment and Housing Act, section 12900 et seq.

13

principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).)

The plaintiff has the initial burden to establish a prima facie case of discrimination. (*Guz, supra,* 24 Cal.4th at p. 354.) This step is designed to "eliminate at the outset the most patently meritless claims." (*Ibid.*) The specific elements of a prima facie case "may vary depending on the particular facts," but generally include evidence that the plaintiff: (1) was a member of a protected class; (2) was qualified for the position he or she sought or was performing competently in the position he or she held; (3) suffered an adverse employment action; and (4) was subject to some other circumstance suggesting discriminatory motive. (*Guz, supra,* 24 Cal.4th at p. 355.)

If a plaintiff establishes a prima facie case at trial, a rebuttable presumption of discrimination arises. (*Guz, supra,* 24 Cal.4th at p. 355.) The employer may rebut that presumption by producing admissible evidence raising a genuine issue of fact that, if resolved in the employer's favor, would establish that the employer's action "was taken for a legitimate, nondiscriminatory reason." (*Id.* at pp. 355–356.) If the employer sustains this burden, "the presumption of discrimination disappears," and the plaintiff must provide evidence that the employer's proffered reasons were pretextual or offer other evidence of a discriminatory motive. (*Id.* at p. 356.) The ultimate burden of persuasion to prove actual discrimination remains with the plaintiff. (*Ibid.*)

Evidence that an employer's proffered reasons were pretextual does not necessarily establish that the employer

14

intentionally discriminated: " ' "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." ' " (*Frank, supra,* 149 Cal.App.4th at p. 824, quoting *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 146–147.) However, evidence of pretext is important: " 'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.' " (*Frank*, at p. 824.)

> **b.** ***The Officers failed to introduce sufficient evidence to show that they suffered adverse employment treatment as a result of their race***

The Officers presented a prima facie case of discrimination with evidence that: (1) they are Hispanic; (2) they continued to receive favorable employment reviews after the shooting incident; (3) they suffered adverse consequences from the decision not to return them to the field; and (4) other circumstances existed, including an unusually long benching despite LAPD findings that the Officers' use of deadly force was justified and that the Officers made only tactical mistakes.

In response, the City introduced evidence of various claimed justifications for the Officers' benching, including: (1) the significance and consequences of the Officers' tactical mistakes, which led to the death of an innocent person; (2) the Officers' failure to recognize the seriousness of the shooting and that they had made any mistakes; (3) concerns about the consequences to the Officers if they were to be involved in another incident; and (4) risk management concerns for the City and the public if the Officers were to be involved in another controversial incident.

15

After review of the record, and as discussed further below, we conclude that the Officers failed to provide evidence sufficient to rebut the City's proffered justification that the Officers were kept out of the field because of concerns about the possible consequences to the Department and to the City if they were involved in a future incident.

### i.  *The Officers' theory at trial*

The Officers tried their case on the theory that they suffered discriminatory treatment because they are Hispanic and they shot an African-American man.  As part of that theory, they argued that the court and the jury could find discriminatory animus if the LAPD considered the race of the *victim* in making employment decisions about the Officers.

The Officers' operative complaint alleged that "[t]he race of Plaintiffs, *and the race of the African-American that was shot by Plaintiffs*, while performing their duties as police officers, was a substantial motivating reason for causing damages and injuries to Plaintiffs."  (Italics added.)

The Officers made similar arguments to the trial court.  In opposing the City's motion for a directed verdict, the Officers argued that the LAPD could not properly make *any* employment decision based on race:  "It doesn't matter whose race it is."  They also emphasized the race of the victim in summarizing the evidence that they argued was sufficient to go to the jury.  They cited Jacobs's statement in the May 17, 2012 meeting that "African American groups were angry about the shooting," and claimed that they were treated differently than Bua because the evidence showed "Bua shooting a Hispanic person and not having anything happen to him."

16

The Officers adopt a different approach on appeal. They do not argue that they could prove unlawful discrimination by showing disparate treatment based upon the race of the shooting victim. Rather, they affirmatively cite authority stating that, to prove discriminatory animus, a plaintiff must show "that the *plaintiff's race* was a substantial factor in the adverse employment decision." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 375 (*Horsford*), italics added.) And they agree that "[i]n line with governing authority, the trial court properly instructed the jury that, to prove discrimination, Officers Diego and Corrales must establish that '*Allan Corrales and/or George Diego's race was a substantial motivating reason for the City of Los Angeles's conduct.*' " They claim that they introduced sufficient evidence to support the jury's finding that their own race, Hispanic, was a substantial motivating factor for the City's conduct.

The Officers' revised theory on appeal is consistent with the governing law. Section 12940, subdivision (a) prohibits an employer "because of the race . . . of any person, to . . . discriminate against *the person*." (Italics added.) The plain intent is to prohibit employers from discriminating against an employee because of his or her race, not because of the race of some third person. As the Officers recognize, cases that explain the elements of an employment discrimination claim under this section assume this interpretation. (See *Horsford, supra,* 132 Cal.App.4th at p. 375; *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713 [elements of a discrimination claim include proof of the plaintiff's "membership in a classification protected by the statute" and "discriminatory animus on the part

of the employer toward members of *that classification*," italics added].)

The conclusion that the Officers were required to show disparate treatment because of *their* race is also consistent with the purpose of section 12940. That section addresses unlawful employment practices. (See § 12940; see also § 12920 ["It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race"].) A claim that asserts disparate treatment based upon the race of the victim of police conduct is not an employment discrimination claim.

For example, if a police department were to adopt a formal rule that unjustified shootings of African-Americans would be punished more severely than shootings of persons of other races, it might well raise constitutional or other legal issues. However, assuming that the policy was applied equally to all police officers regardless of race or other protected status, those issues would not concern *employment* discrimination, but would arise from the rights of the victims whose lives were valued differently in the department's disciplinary process. Even if an individual officer had standing to assert such a claim (which we need not consider), the claim would not assert the officer's right to equal treatment in the workplace but would be based on the victim's right to equal consideration in the disciplinary process.

The City argues that the Officers' change of tack on appeal warrants reversal. The City cites cases holding that " ' "the theory upon which a case is tried must be adhered to on appeal." ' " (*Martin v. PacifiCare of California* (2011) 198 Cal.App.4th 1390, 1409, quoting *Richmond v. Dart Industries,*

18

*Inc.* (1987) 196 Cal.App.3d 869, 874.) Those cases are based on the principle that permitting a change of theory on appeal " ' "would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." ' " (*Martin*, at p. 1409; *Richmond*, at p. 874.)

Here, the Officers have not so much changed their theory on appeal as truncated it. Colloquy during arguments on the City's motion for directed verdict suggests that the trial court understood that the Officers' claim was based at least in part on alleged discrimination based upon their own Hispanic race. The trial court responded to the City's argument that an employment discrimination claim could not be based on the race of the victim by questioning whether that was the theory the Officers actually presented in their opening statement: "The theme and even the cross-examination of [the Officers], I thought it was because they were Hispanic." In response, the Officers' counsel stated: "We do have that theory. But I think it's even broader. And I think the [California Fair Employment and Housing Act] is broader." He identified the role of the victim's race as an issue that he had their "appellate guys" look at, and "that's going to be decided up there."

Thus, the Officers' change in theory does not itself warrant reversal simply on grounds of fairness to the City and the trial court. However, the change of theory does have consequences for the Officers' case. Without considering alleged differences in the Officers' treatment due to the victim's race, the evidence is not sufficient to support the Officers' employment discrimination claim.

Uncoupling the Officers' race from the race of victim Washington in analyzing the sufficiency of the evidence does not

19

just preclude the Officers from relying on evidence that they were treated differently because their shooting involved an African-American man.  Ironically, it also means that some evidence the Officers introduced helps *support* the City's risk management justification.

ii. ***Evidence supporting the City's risk management explanation***

As discussed above, the City claimed that part of the reason for benching the Officers was risk management.  Chief Beck testified that the Officers had opportunities for advancement and meaningful work in the Department in non-field positions.  However, "if these young men were to get into a similar field situation and do something similar in the future, if they were involved in another, quote, unquote, 'bad shooting,' there's not enough money in the city to cover that."  He explained that risk management is "a big part of my job."  He does not base his decisions "solely on monetary reasons, but that's one of the things I have to look at.  I have to not only look at the community and my cops, but I have to look after my city."

City witnesses also testified about the importance of community reaction to the Washington incident and the Department's relationship with the Commission, which is charged with public oversight of the Department.  For example, Jacobs explained that "these officers were involved in a very significant event that took the life of an innocent man.  They were found to have administrative disapproval in that—by the civilian Police [Commission] that oversees us, that we report to, but in reality are our bosses.  If they were to be involved in another incident, especially a significant incident, but any incident, I think the public would question what the Department

20

is doing and that public confidence would be shaken.  When the public confidence is shaken, it's not just the effect on these two officers, but it's the effect on the public and the entire Department."

The Officers themselves introduced evidence that they were benched for "political" reasons that were similar to the concerns that the City labeled "risk management."  Those reasons included the reaction of the community and the Commission to the fact that the victim of the shooting was African-American.  Diego testified that, at the May 2012 meeting, Jacobs said that the Officers were benched because "it was political and we had shot an unarmed male Black."  When Diego asked why Officer Bua had not been removed from the field, Jacobs said that it was "because yours is political and you shot an unarmed male Black."  Diego testified that he believed Jacobs used the term "nuclear rock" or "nuclear time bomb" to refer to the Officers, which Diego understood to mean that Jacobs was "pretty much letting us know how the Commission, John Mack, had it out for us."[5]  The Officers' counsel also elicited testimony from Jacobs that he told the Officers, "Do you realize that you killed an unarmed, autistic Black man," and that "there was a great deal of community concern about the incident."

An employment decision based on political concerns, even if otherwise unfair, is not actionable under section 12940 so long as the employee's race or other protected status is not a substantial

---

[5] In his closing argument, the Officers' counsel characterized Jacobs's statements as politically motivated: "Jacobs said, 'You killed an unarmed Black man.  That is political.  That African American groups were angry about the shooting.  That the Police Commission was out to get you."

21

factor in the decision. For example, in *Slatkin v. University of Redlands* (2001) 88 Cal.App.4th 1147 (*Slatkin*), the court affirmed summary judgment despite evidence that university decision makers were prejudiced in deciding to deny the plaintiff tenure because their prejudice arose from workplace politics rather than the fact that the plaintiff was Jewish. (*Id.* at p. 1159; see *Chen v. County of Orange* (2002) 96 Cal.App.4th 926, 930–931 [evidence showing that the plaintiff was denied a promotion because her husband was in political disfavor did not show that the employer discriminated on the basis of the plaintiff's marital status].)

Thus, abundant evidence, including some introduced by the Officers, supported the City's claim that the Officers remained benched because of the possible consequences of returning them to the field, not because of their race.

### iii. *The Officers' evidence of discriminatory intent*

The Officers attempted to link the political reasons for their benching with *their* race by claiming that they would have been treated differently if they had been African-American.[6] While this claim would support a verdict of employment discrimination if true, the Officers did not provide evidence sufficient to support

---

[6] In opposing the City's motion for a directed verdict, the Officers' counsel cited the Officers' testimony that "[i]f I was a Black officer, I know this would not have happened." And in closing he argued that "if they were Black, African American officers, they would have been back in the field. . . . So the question you have to ask, don't the Officers' race play a factor in the decisions to keep them out of the field? And I submit to you it does. If they were African American officers, they would be back out in the field and that's just a fact."

it.  None of the categories of evidence the Officers introduced in support of their claim could support a reasonable inference that their race was a substantial factor in the City's decisions.

**The Officers' Testimony**

Diego testified, "I really believe if I would have been an African American officer, that this wouldn't have happened."  He also opined that "based on everything that Mr. Jacobs was telling us about John Mack and the Police Commission . . . I personally feel like if we had been Black or whatnot, if it was a race on race thing, that we wouldn't be in this situation."

A plaintiffs' subjective feelings or beliefs are not sufficient to support a discrimination claim.  They are simply speculation, or, at best, conclusions—not competent evidence from which a jury could find discrimination.  (See *McRae, supra,* 142 Cal.App.4th at p. 398 [plaintiff's "beliefs are not substantial evidence of defendants' motivation"].)

**Disparate Treatment**

The Officers relied heavily upon the Bua incident to show that they were treated differently for reasons of race.  That incident could not rationally support the inference that they suffered disparate treatment because of *their* race.

As discussed above, evidence suggesting that Bua was treated more favorably because the shooting victim in that case was Hispanic rather than African-American—which the Officers repeatedly emphasized—cannot support an employment discrimination claim by the Officers.  And nothing about that incident logically supports the Officers' argument that they would have been treated differently if they were African-American.  That argument is not based upon the fact that the Officers are Hispanic, but rather that they are *not* African-American.  Bua is

23

also not African-American. Thus, the Officers' own theory suggests that Bua would have been treated the same if he had been involved in an incident similar to that of the Officers.[7]

Nor does the Bua incident support any inference that Bua was treated differently because he is White, which the Officers now appear to suggest on appeal. Such an inference cannot logically be drawn because of the significant differences between the Bua incident and the shooting in which the Officers were involved. Those differences of course include what the Officers repeatedly argued at trial was the *key* distinction—the race of the victim. The Officers' attempt to pivot on appeal and use the Bua incident to support a more traditional, anti-Hispanic discrimination claim is inconsistent with their own claim below that the significant factor leading to Bua's return to the field was the race of the victim.[8]

The circumstances of the Bua shooting were also significantly different. Whereas the Officers' shooting involved an innocent, unarmed, autistic man that the Officers initially did not perceive to be a threat, the Bua shooting involved a person who was reported to be armed and was engaged in violently

---

[7] The Officers themselves made this point in closing argument: "So here we have Bua shooting a Hispanic male and he's a White officer. Nothing happens. Back in the field. And I think six weeks, nothing. Now, if you were to ask yourself what would have happened if Bua had shot an unarmed Black male, I think if you're honest with yourselves, you would come to a different conclusion."

[8] In addition to making this point during closing argument, the Officers emphasized it in opposing the City's directed verdict motion. The Officers cited Bua as an example of "shooting a Hispanic person and not having anything happen to him."

attacking an occupied vehicle (albeit with a small bat rather than what Bua perceived to be a gun).**9**  And, of significance to the City's risk management justification, the Bua incident did not result in any public outcry.

Moreover, the Bua incident could not support the Officers' argument that the Commission treated them more harshly because of their race.  The Commission treated Bua and the Officers the same.  In both cases the Commission concluded that the involved officers acted "out of policy."  That was the only decision the Commission made.  The evidence was uncontradicted that Chief Beck, not the Commission, has sole discretion to decide the discipline and other consequences for officers based upon the Commission's conclusions.  And there is no evidence that anyone on the Commission—including John Mack—applied any pressure on Chief Beck concerning the consequences that he should impose on the Officers as a result of the Commission's findings.**10**

---

**9** The Officers question whether there was reliable evidence apart from statements from the Washington family that Washington was in fact autistic.  For purposes of the Officers' claim, this does not matter.  That Washington was *reported* to be autistic affected community perception of the incident and heightened the sensitivity of the event, supporting the City's risk management justification for keeping the Officers out of the field.  Blake testified that, shortly after the shooting, "what we were hearing more than anything else [was] that we had shot a young man that was autistic."

**10** The Officers argued that Mack is African-American and had recently received an award from Loyola Law School named after the late Johnny Cochran, whose firm represented the Washington family in their wrongful death lawsuit against the City.  In their opening statement, the Officers went so far as to claim that the reason the Officers are not back in the field "is

**Pretext**

Much of the Officers' evidence concerned their claim that the City's decision to keep them out of the field was not warranted by the Department's analysis of their conduct. That evidence included the Department's initial determination that the Officers' decisions to exhibit their weapons and to use force were both in policy, as well as testimony by the Officers themselves and by a use of force expert originally retained by the City who criticized the Officers' tactics but opined that their use of force was reasonable.

This evidence was relevant to rebut the City's proffered justification that the Officers' tactical mistakes were a reason for keeping them out of the field, and supported the jury's finding that the Officers' "poor tactics" were not a "substantial motivating reason for the City . . . to subject [them] to one or more adverse employment actions." However, that evidence was not relevant to rebutting the City's proffered risk management justification. The decision to keep the Officers out of the field could be justified by the risk to the Department if they were to be involved in another incident even if their tactical mistakes would not otherwise warrant benching them.

The Officers' reliance on evidence that they were benched for an unusually long period of time falls in the same category. The Officers cite the testimony of one witness, Sergeant O'Donnell, who said that for several years he maintained a list of

---

because of John Mack. Not because they had violated any policy, but because of John Mack." The suggestion that Mack must have unduly influenced the LAPD's treatment of the Officers because of his race and/or community involvement does not rise above speculation.

26

officers who were not field certified following a use of force proceeding. He testified that he had never known an officer that had not been returned to the field after a five-year period for a shooting that was out of policy.[11] While the unusual length of time the Officers were kept out of the field might cast doubt on the City's justification that their benching was because of their tactical failures, it does not contradict a serious risk prevention concern. In any event, this evidence does not suggest discrimination. There was no evidence concerning the circumstances surrounding the shootings that led to shorter benchings or the race of the other officers involved. Given the uncontradicted testimony that Hispanic officers constitute at least 45 percent of the sworn officers in the LAPD (larger than any other racial group), one certainly cannot assume that all the other shootings that resulted in shorter periods of benching involved only non-Hispanic officers.

For similar reasons, the Officers' evidence that they were recommended for job promotions by other officers does not undermine the City's risk prevention justification. The Officers could be perceived internally as competent but still be a risk to the Department if they were involved in another incident.

The Officers also cite evidence that they were not placed within the purview of an LAPD department called the "Risk Management Executive Committee" (RMEC). However, unchallenged evidence from Jacobs and Chief Beck explained

---

[11] The Officers argue that a five-year benching was inconsistent with the City's policy, but do not identify any such policy. The Officers cite O'Donnell's testimony, but that testimony showed only that O'Donnell was not aware of a similar benching, not that it violated LAPD policy.

27

that RMEC involves a structured system that focuses on officers with ongoing disciplinary issues, which did not apply to the Officers' situation. That description was consistent with an e-mail that the Officers introduced explaining to Corrales that RMEC reviews the performance of officers and "can take corrective steps to address any performance, behavioral, or managerial concerns." In light of this uncontroverted evidence, the City's decision not to include the Officers in RMEC could not support the conclusion that the City's risk management justification was mere pretext.

The Officers also argue that the City's risk management justification was dubious because they were permitted to carry guns and were assigned to work LAPD carnivals where gang members were present. But the City's decision not to impose *greater* restrictions on the Officers does not logically undercut the City's risk management concern that they not represent the Department as patrol officers.

**Rejections of promotions and off-duty work**

As discussed above, the Officers applied for various promotions and for off-duty work permits, which were denied. However, almost all the denials were for a single reason—the fact that the Officers were not field certified. The Officers identify only one position for which either Diego or Corrales applied where the lack of field certification was not a disqualifying factor. Diego was denied for that position in the Use of Force Review Division in April 2012. There was conflicting evidence concerning where Diego fell in the field of candidates and who recommended him for the position. However, Diego testified that he was told he was approved for the position up to the level of Assistant Chief MacArthur, but he was denied by Deputy Chief Jacobs and/or

Chief Beck because they did not want the Commission to perceive that he "was being rewarded." Accepting this testimony, as we must, the evidence nevertheless does not support an inference of discrimination. A decision to deny Diego the position for political reasons does not suggest an impermissible consideration of race. There was no evidence concerning the race of the successful candidate, and the evidence was undisputed that all three finalists were qualified for the position.

The off-duty work that the Officers sought required them to carry a gun. The parties disputed whether the Department could lawfully deny the Officers' off-duty work permits because they were not field certified.[12] But that conflict is also not material. Even if the denial of their work permits violated Department policy or regulations, it does not support an inference of discrimination. The Officers did not provide any evidence showing that non-Hispanic officers were granted work permits in similar situations, or any other evidence suggesting that the real

---

[12] Craig Heredia (the adjutant to Tina Nieto, who was the area captain of the Olympic Station when Corrales applied for an off-duty work permit to work for the Dodgers in late 2011), wrote a memorandum concerning information he received from various persons within the Department's Personnel Group suggesting that employees "have a legal right to outside employment," and that the lack of field certification cannot "arbitrarily affect" an officer's right to work off-duty. The head of the Personnel Group at the time, Gloria Grube, testified that the lack of field certification is a factor in deciding, on a case-by-case basis, whether a work permit is appropriate and that officers who are not field certified should not be armed and uniformed in an off-duty job. After his off-duty work permit was denied, Corrales filed an administrative complaint against Nieto, which was ruled "unfounded."

29

reason for the denial was race rather than risk management concerns.

**Statements by Nieto**

The Officers cite testimony about a meeting in which Diego asked about the possibility of promoting to various positions that were available. At the meeting, Nieto said in a mocking manner that Diego could apply, but he would not get any of the spots because he was benched. When Diego alluded to a requirement that officers be told monthly about the reasons for the restriction, Nieto said something to the effect of "I'll make up a reason."

This evidence suggests that Nieto was annoyed and even rude, but it does not show discrimination. Nieto did not make the decision whether the Officers would remain benched; Chief Beck did. There is no evidence suggesting that Nieto, who is Hispanic, could or did influence Chief Beck in that decision.

Considered as a whole, the evidence does not provide any rational basis to reject the City's explanation that the LAPD benched the Officers because of risk management concerns and not because of their race. (See *Frank, supra,* 149 Cal.App.4th at pp. 816–817 [an inference cannot support a verdict if it is unreasonable in light of the whole record].) Indeed, key portions of the Officers' own evidence and argument tend to support that justification.

While the jury could rationally have found that other asserted reasons for the Officers' benching were pretextual—such as the tactics the Officers employed in encountering Washington—the Officers could not prevail just by showing that some proffered justifications were untrue. Even a covert reason for an employment decision can show that the decision was not discriminatory if the evidence shows that it was the real reason.

(See *Slatkin, supra,* 88 Cal.App.4th at p. 1158 ["all the evidence that the [defendant's] claimed reasons were dishonest pointed equally to the conclusion that its true reasons were nondiscriminatory"].)  We therefore conclude that there was insufficient evidence to support the Officers' discrimination claim.

### c.    *The jury's verdict was not based on a complete explanation of the law*

The Officers argue that the jury was properly instructed that it must find discrimination based upon the Officers' race, and the special verdict shows that it did so.  The Officers cite authority that an appellate court must presume that a jury has followed a trial court's direction based upon a proper instruction. (See *McIntyre v. Colonies-Pacific, LLC* (2014) 228 Cal.App.4th 664, 674.)

This argument does not mandate affirmance here.  As discussed above, this court may reverse despite the jury's verdict if we find that, based upon all the evidence, the trial court should have granted a directed verdict.  For the reasons discussed above, we conclude that the trial court should have done so.

Although not necessary for that conclusion, a gap in the jury instructions is relevant to the Officers' argument and merits some discussion.  That gap could have created confusion in the jury's understanding of the significance of the victim's race in determining whether there was unlawful employment discrimination.

The trial court instructed the jury that the Officers must prove that the City subjected them to an adverse employment action, and that "*Allan Corrales and/or George Diego's race* was a substantial motivating reason" for the City's conduct.  (Italics added.)  In explaining the concept of adverse employment actions,

31

the court also instructed that the Officers claimed "that they were denied employment opportunities, denied promotions, denied off-duty work opportunities, denied overtime opportunities and denied transfers because of *their race*."  (Italics added.)  The special verdict form also required the jury to find that the Officers' race was a "substantial motivating reason" for the adverse employment actions.

Thus, the instructions and verdict form clearly explained that the jury must find that *the Officers'* race was a substantial factor in the City's employment decisions.  However, neither party requested, and the trial court did not provide, any instruction specifically explaining that the jury could not find discrimination based on the *victim's* race.

The lack of such an instruction permitted the Officers to blur the distinction between alleged differential treatment due to the race of the victim and the race of the Officers.  For example, in closing argument the Officers suggested that *any* consideration of "race" in how the Officers were treated was unlawful:  "[W]hat we have shown you here is that both Diego and Corrales were essentially thrown under the bus because of race.  And that is a big component in this case and I'll show you why."  The race of the victim was a prominent component of that theme.  The Officers suggested that "the big elephant in the room, this was about race.  Because two Hispanic officers had killed an unarmed African American."

The Officers also suggested that any consideration of race was sufficient to reject the City's risk management justification for its decision to bench the Officers.  The Officers argued: "Jacobs refers on the witness stand, he's actually—when we're talking about why aren't [the Officers] back now, he's talking

32

about Ferguson and the Ford shooting as to why Diego and Corrales can't return to the field. Well, that's race; isn't it? I mean, Ferguson is all about race and the Ford shooting is about race also. So why are they being punished for something that happened in Missouri or something that happened to Ezell Ford by some officer in Newton Division?"[13] The Officers suggested that any political considerations stemming from the race of the victim were out of bounds: "Jacobs said, 'You killed an unarmed Black man. That is political. That African American groups were angry about the shooting. That the Police Commission was out to get you.' "

The City did not object to this argument, and does not raise either the Officers' argument or any issue with the jury instructions as a ground for appeal. But it did argue in moving for a directed verdict that the evidence of discrimination based upon the Officers' race was insufficient and that the Officers "cannot cure that defect by simply saying, 'Well, it's not our race that's employed here. It's the race of the victim, Mr. Washington.' " The City also pointed out that "there is no case, that I'm aware of, that says that an employee can sue for race discrimination based on someone else's race."

We cannot say whether the jury's verdict would have been different if this concept had been fully and clearly explained in the instructions. However, we can and do agree with the City that the trial court should not have permitted the case to go to the jury based upon the evidence that the Officers provided. (See

---

[13] As mentioned above, the Officers also focused on the race of the victim in emphasizing the significance of the Bua incident, arguing that Bua would have been treated differently if he had "shot an unarmed Black male."

*Adams, supra,* 68 Cal.App.4th at pp. 262, 288 [reversing jury verdict on the legal ground of the absence of a duty of care, which the appellants raised in their motion for directed verdict].)

3.     *The Evidence was Insufficient to Support a Verdict of Retaliation*

Section 12940, subdivision (h) prohibits an employer from discriminating against any person because the person has "opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." The Officers claim that their filing of this lawsuit "sealed their fate within LAPD," and that they remained benched because they filed this case.

The Officers established a prima facie case of retaliation by providing evidence that they had been benched for an unusually long period of time after they filed this lawsuit given the LAPD's findings concerning their tactical mistakes, leading to adverse employment consequences. (See *Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1220 (*Joaquin*) [plaintiff LAPD officer established a prima facie case of retaliation with evidence that he reported sexual harassment, he was performing competently, and he suffered an adverse employment action].) The City proffered the nondiscriminatory justifications for the Officers' continued benching, discussed above. Having provided evidence supporting those justifications, the presumption of retaliation disappeared and the burden shifted to the Officers to prove the elements of retaliation: (1) the employee's engagement in a protected activity (i.e., filing the lawsuit); (2) retaliatory animus on the part of the employer; (3) an adverse action by the employer; (4) a causal link between the retaliatory animus and the adverse action; (5) damages; and (6) causation. (*Ibid.*)

The City disputes the elements of retaliatory animus and causation. The City argued below in its motion for a directed verdict and argues on appeal that the evidence of events occurring after the Officers filed their lawsuit is not sufficient to show that the City subjected them to any adverse employment action because of the lawsuit. We agree.

Other than a few specific events that occurred after November 30, 2012 (the date the Officers filed their complaint in this case), which we discuss below, the Officers' proof consisted of evidence that "Chief Beck *continued* to bench the officers." Thus, the Officers cannot rely on the timing of the City's employment decisions to draw any inference of retaliation, as is typically done in retaliation cases. (See, e.g., *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 615 [causation may be proved by circumstantial evidence such as " ' "the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision" ' "], quoting *Jordan v. Clark* (9th Cir. 1988) 847 F.2d 1368, 1376.)

As discussed above, the City provided evidence—which was *supported* in important respects by the Officers' own evidence and argument—that the Officers were benched because of the political sensitivity of the shooting in which they were involved and the possible devastating consequences to the City if they were to be involved in a future controversial incident. The fact that the benching continued, even for the five-year period that the Officers identify as unusual, is fully consistent with that justification and cannot itself support a conclusion that the City's motives changed after the lawsuit was filed. (See *McRae, supra,* 142 Cal.App.4th at p. 397 [employee failed to sustain her burden

35

of demonstrating that her transfer to another facility was due to retaliation for filing a grievance rather than for the employer's claimed desire "to remove her from an environment where she could not function effectively"].)

The Officers' own testimony suggests that their lengthy benching was due to factors that were already present before they filed their lawsuit. Diego testified that, after the Officers' meeting with Jacobs in May 2012 (six months before the lawsuit), he "definitely thought we're done. We're screwed." As a result of the meeting, he changed his mind that their situation was temporary. "We felt that there was no other option," and Diego therefore sought legal help, even though that was "the route I definitely didn't want to go." Corrales also testified that he filed the lawsuit because he believed the Department was not going to do anything further in terms of putting him back in the field. Thus, the Officers did not decide to pursue legal action until they had already concluded that they would not be returned to the field.

The particular significance of causation evidence in retaliation claims is another reason to conclude that the continuation of a preexisting employment status is not in itself sufficient to support such a claim. Absent sufficient evidence of a causal link, employees can, in essence, create a claim by making a complaint or filing a lawsuit before an anticipated adverse employment action occurs. (See, e.g., *Joaquin, supra,* 202 Cal.App.4th at pp. 1225–1226 [permitting a retaliation claim based on a false complaint about a coworker would allow an employee to " 'immunize his unreasonable and malicious internal complaints simply by filing a discrimination complaint with a government agency' "], quoting *Hatmaker v. Memorial Medical*

*Center* (7th Cir. 2010) 619 F.3d 741, 745–746; *Chen, supra,* 96 Cal.App.4th at p. 948 ["the possibility of a retaliation claim creates the problem of conferring a de facto immunity on the complainant despite poor job performance or the meritlessness of any complaint"].) Permitting an inference of retaliation based solely upon the *continuation* of an already existing adverse employment status creates the same danger that employees might create claims that would not otherwise have any basis, simply by filing a complaint.[14]

Other than evidence that their benching continued after they filed their lawsuit, the Officers identify several other postlitigation events that they claim show a retaliatory motive. None of those events is sufficient to support an inference of such a motive.

**Denial of Diego's application for a promotion in 2013**

The Officers argue that the City retaliated for the lawsuit by denying Diego's application for a promotion to the Olympic Station gang unit in 2013. The evidence showed that Diego was denied that position because he was not field certified. Thus, this event was simply a consequence of Diego's continuing employment status, which, as discussed above, is not sufficient to show retaliation.

**Nieto's Statements**

The Officers argue that the conversation with Nieto, discussed above, in which she said she would "make up a reason"

_____

[14] We do not mean to suggest that the Officers acted with such a motive here. Our discussion of the significance of the causation requirement is simply to emphasize the policy problems posed by the inference of retaliation that the Officers suggest.

for their benching shows a retaliatory motive.  But Diego testified that this conversation occurred in October or November 2011, a year before the Officers' filed their lawsuit.  This event therefore cannot support any inference of a causal link between the lawsuit and the Officers' benching.[15]

**The Bua shooting incident**

The Officers argue that the City's different treatment of the Officers and Bua demonstrated a retaliatory motive as well as disparate impact.  For the reasons discussed above, the Bua incident does not contradict the City's stated risk management reasons for the Officers' benching.  The differences between that incident and the shooting in which the Officers were involved— including the race of the victims—precludes any valid comparison.

**Change in the composition of the Commission**

The Officers cite evidence of a conversation concerning the Officers between Chief Beck and Heredia at the end of November 2012.  The occasion for the conversation was Chief Beck's visit to the Olympic Station as part of a visitation program.  After roll call, in a private conversation Heredia asked why the Officers were still benched.  The chief said in "an around about way" that he was protecting the Officers from being involved in any future

---

[15] The Officers cite testimony from Officer Susan Garcia, who was also present during this conversation.  Garcia testified that Nieto later talked with her alone about that conversation and told her that she had better "watch what I say" about the conversation and if she didn't "I'm going to find myself in trouble."  Garcia recalled that her conversation with Nieto occurred on March 11, 2013.  But she was careful to state that it "wasn't the same day" as the conversation involving Diego.

"use of force" proceedings that would "ultimately be adjudicated by the same Police Commission who, in fact, overturned the Chief's recommendations on the shooting." Chief Beck also said that "we are due for a new mayor," and "oftentimes, the makeup of the Police Commission is changed by the mayor who appoints those positions." The Officers argue that the Officers' continued benching after the composition of the Commission changed under the new mayor shows a retaliatory motive.

The evidence concerning this conversation is not sufficient to support a conclusion that the City retaliated against the Officers by keeping them benched. Chief Beck testified that he did not tell Heredia that the Officers would go back to the field if the composition of the Commission changed. He said that his explanation of possible changes to the Commission after the mayoral election was in response to a question by Heredia about how long the Commission was there. Heredia's description of their conversation does not contradict that testimony. This evidence is fully consistent with the City's claim that the Officers' benching was due to concerns about the possible consequences of another incident involving the Officers if they were returned to the field.

The Officers failed to introduce evidence sufficient to show that retaliation for the lawsuit was a substantial factor in the City's employment decisions. The trial court therefore should have granted the City's motion for a directed verdict on the Officers' claims for both unlawful retaliation and discrimination.

"When the trial court erroneously denies a defense motion for a directed verdict and permits the matter to proceed to a jury verdict in favor of the plaintiff, the remedy on appeal is to direct the court to enter judgment in favor of the defendant." (*Quinn v.*

*City of Los Angeles* (2000) 84 Cal.App.4th 472, 484, citing *Adams, supra,* 68 Cal.App.4th at pp. 263, 288.)

## DISPOSITION

The judgment is reversed with directions that judgment be entered in favor of the City of Los Angeles.  The City is entitled to its costs on appeal.

CERTIFIED FOR PUBLICATION.

LUI, J.

We concur:

CHANEY, Acting P. J.

JOHNSON, J.