Filed 2/24/26  Majovski v. City of Los Angeles CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
| --- | --- |
| KAREN MAJOVSKI, | B335739 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 21STCV07957) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gail Killefer, Judge.  Affirmed.

Shegerian & Associates, Carney R. Shegerian and John David for Plaintiff and Appellant.

Ballard Rosenberg Golper & Savitt, Linda Miller Savitt, Jonathan S. Rosenberg and John J. Manier for Defendant and Respondent.

_____

Karen Majovski appeals from a summary judgment in favor of Respondent, the City of Los Angeles (the City), on her claims of gender discrimination and retaliation under the Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.), the Equal Pay Act (EPA; Lab. Code, § 1197.5), and Labor Code section 1102.5 (Section 1102.5). Majovski is a deputy city attorney (DCA) in the City Attorney's Office. Memoranda of understanding (MOUs) between the City and DCA labor unions determine a DCA's salary by the DCA's classification (DCA-I through DCA-IV) and "step" within that classification.

The City hired Majovski as an entry-level DCA-I in May 2014, when she had five months of experience practicing law. The City promoted her to DCA-II four years later, in July 2018, and promoted her to DCA-III four years after that, in June 2022 (during this litigation). Majovski primarily alleges that the City denied her an earlier promotion to DCA-III because of her gender or because she had complained that she believed she was underpaid because of her gender.

The trial court granted the City's motion for summary judgment, concluding that the undisputed facts did not create triable issues as to whether Majovski was underpaid or otherwise subjected to an adverse employment action because of her gender or protected activity. Majovski filed a first notice of appeal from the judgment after the trial court issued its order granting the City summary judgment, but before the trial court entered the judgment. After the judgment was entered, she filed a second, untimely appeal, which she promptly abandoned. The City moves to dismiss the first, instant appeal because Majovski filed it before judgment was entered, and because she abandoned her second, untimely appeal.

2

We exercise our discretion to treat Majovski's first notice of appeal as if it had been timely filed immediately after the judgment's entry, and conclude that Majovski's abandonment of her second, untimely appeal does not bar the instant appeal. Thus, we deny the City's motion to dismiss the appeal. On the merits, we conclude that the trial court properly granted the City summary judgment. Accordingly, we affirm.

## BACKGROUND

### A. MOUs determine a DCA's salary by the DCA's classification and pay step.

The City Attorney's Office has four DCA classifications: DCA-I, DCA-II, DCA-III, and DCA-IV (higher attorney classifications have titles other than DCA). Within each classification, there are multiple pay "steps," which were designated by letters before January 22, 2017, and by numbers after that date.

At all relevant times, the terms of Majovski's employment were subject to one of two materially identical MOUs between the City and Majovski's labor union.[1] The MOUs contained salary tables that specified all DCAs' annual salaries by classification and step (e.g., MOU 29 provided that between January 15 and

---

[1] During Majovski's assignment to the Employment Litigation Division (ELD), she was subject to MOU 31, an agreement with the International Union of Operating Engineers, Local 501, AFL-CIO. At all other times, Majovski was subject to MOU 29, an agreement with the Los Angeles City Attorneys Association.

3

July 1, 2014, every DCA-I at step A had an annual salary of $73,330.56).

The MOUs generally provided that every DCA would advance to the next step within the DCA's current classification after one year of service at the DCA's current step. Under certain conditions, the MOUs also provided for automatic promotions from DCA-I to DCA-II, and from DCA-II to DCA-III. However, promotions from DCA-III to DCA-IV (and to higher classifications) were never automatic.

The City Attorney had discretionary authority to promote any DCA to a higher classification or advance any DCA to a higher step, subject to the availability of funds in the budget approved by the City Council and the Mayor. Most discretionary promotions and step advancements were granted through competitive processes known as Performance Recognition Programs (PRPs). Discretionary promotions and step advancements granted outside a PRP were relatively rare.

The City produced statistical evidence regarding the gender of all DCAs who received discretionary promotions between 2016 (when Majovski first requested a promotion to DCA-III) and 2022 (when she received such a promotion). Of 240 discretionary promotions, 126 (52.5%) were received by female DCAs and 114 (47.5%) by male DCAs. Regarding discretionary promotions from DCA-II to DCA-III specifically, 15 of 27 such promotions (55.5%) were received by women and 12 (44.5%) by men.

**B.     In May 2014, the City hired Majovski as an entry-level DCA-I.  In November 2016, she transferred to ELD and the City denied her initial request for a promotion to DCA-III.**

Majovski obtained her law degree in 2013 and was admitted to the State Bar in December 2013.  Five months later, in May 2014, the City hired Majovski into the Workers' Compensation Division (WCD) of the City Attorney's Office as a DCA-I, step A, with an annual salary of $73,330.56.  In May 2015 and May 2016, Majovski automatically advanced to steps B and C, raising her salary to $75,606.48 and $82,058.40, respectively.

In November 2016, Majovski transferred to ELD; her classification and step did not change.  At that time, eight other DCAs worked in ELD, including four female DCA-IIIs, three male DCA-IIIs, and one male DCA-I, George Sami.

Shortly before Majovski's transfer to ELD took effect, she told Thom Peters, the Chief Assistant City Attorney for the Office's Civil Litigation Branch (which included ELD), that she believed she should be promoted to DCA-III upon her transfer.  The requested promotion to DCA-III would have raised her salary to at least $129,957.12—an increase of $47,898.72, or 58 percent of her then-current salary of $82,058.40.  Majovski observed that another female attorney, who had graduated from law school two or three years before Majovski, had been hired as a DCA-III.  She did not then allege that she was underpaid because of her gender.

Peters emailed Chief of Staff Leela Kapur to convey Majovski's request.  Peters identified another female attorney, who had been hired as a DCA-III from private practice with seven years of employment litigation experience, and expressed

5

concern about an apparent disparity in expected future compensation between such an "experienced outside attorney" and attorneys who started at a lower classification, including Majovski and male DCA-I George Sami, who would have to work 12 to 15 years before reaching the same salary level.

Kapur responded that the office hired experienced outside litigators, like the female attorney whom Peters identified, into ELD at higher classifications "[i]n order to be able to recruit proven employment litigation attorneys." As for the female DCA-III whom Majovski identified, she had been hired with five years of experience in a specialized practice. In contrast, Majovski "came in with no experience, into an area of practice [workers' compensation] that pays less in the private sector and which is not comparable as to substance and challenge as [employment litigation]."

Kapur told Peters that based on Majovski's level of experience, she did not support promoting Majovski to a higher classification at that time. Kapur added: "[I]f you and/or [Chief Assistant City Attorney] Jim [Clark] would like to recommend step adjustments for her and [male DCA-I George] Sami as we need to treat them similarly, we can discuss. I can't say what that may trigger as far as 'me toos.' "[2]

---

[2] Kapur testified that her reference to " 'me toos' " meant that "there would be likely numerous individuals who would feel that they should be given the same consideration, which is why we were very judicious in doing things outside the PRP process."

**C.     The City provided parking to DCA-IIIs and other employees who qualified for priority under a Special Parking MOU. Majovski did not qualify for priority and was not provided parking.**

Pursuant to a "Special" MOU regarding parking (Special Parking MOU), the City provided employees parking at City-owned facilities—including City Hall East (CHE), the workplace for ELD employees—on a space-available basis according to specified priorities. Of the priorities relevant to this appeal, "Upper Management" was the highest, followed by electric vehicles, and finally seniority. "Upper Management" included DCA-IIIs and higher classifications but excluded DCA-Is and DCA-IIs.

At the time Majovski transferred to ELD as a DCA-I, she did not qualify for priority under the Special Parking MOU and was not provided parking at CHE. All other female attorneys in ELD at that time were provided parking because they had priority as DCA-IIIs. Most of ELD's majority-female support staff were also provided parking because they had priority based on seniority.

In June 2017, Majovski asked ELD supervisor Wayne Song to arrange for her to have parking at CHE. She did not then allege that she was denied parking because of her gender. Nor did she claim to qualify for parking under the Special Parking MOU. She was not provided parking.

In July 2017, the City hired Susan Rim as a DCA-II in ELD. Because she was not a DCA-III, Rim was not provided parking.[3]

Majovski declared that she saw male DCA-I George Sami park at CHE "on a regular basis." Doug Lyon, a DCA-III in ELD, similarly testified that he saw Sami park at CHE "multiple times," adding: "And the reason that I remember is he [Sami] got an electric car, had already had it. And I got an electric car and saw him. And he was using the charger . . . and he was helping me do that." As noted, electric vehicles have priority for parking under the Special Parking MOU. Majovski did not have an electric vehicle.

**D.      In spring 2018, Majovski complained that she and Susan Rim were underpaid, and again requested a promotion to DCA-III. In July 2018, the City promoted Rim to DCA-III and Majovski to DCA-II.**

In January 2017, pay steps were converted from letters to numbers; Majovski was redesignated as a DCA-I, step 10. In May 2017 and May 2018, she automatically advanced to steps 11 and 12, raising her annual salary to $104,692.32 and $109,745.28, respectively. In June 2018, pursuant to MOU 31, her salary at step 12 increased to $111,937.68.

At an unspecified time in spring 2018, Majovski "discussed 'pay disparity' " with ELD supervisor Eric Brown (who had replaced Song) and complained to Civil Litigation Branch Chief Thom Peters that she and Susan Rim should be promoted to

---

[3] In April and May 2018, the City provided Majovski and Rim temporary parking at CHE during a trial that they litigated together.

DCA-III.  It is undisputed that "there were more females than males in the Employment Litigation Division who were DCA III's," and that Majovski's "complaint regarding pay was based on her belief" that she and Rim were "underpaid compared to *everyone else* in the Division – both males and females."  (Original italics, boldface omitted.)

On July 1, 2018, the City promoted Majovski to DCA-II (not DCA-III), step 7.  The City concurrently promoted Rim from DCA-II to DCA-III.  As a DCA-III, Rim was provided parking at CHE.

Majovski's promotion to DCA-II raised her salary to $120,122.64—an increase of $8,184.96, or 7.3 percent of her then-current salary.  In contrast, her requested promotion to DCA-III would have raised her salary to at least $133,590.24—an increase of $21,652.56, or 19.3 percent.  Kapur declared:  "At the time of this promotion request, Plaintiff had been practicing law for about four years and had been practicing as a civil litigator for about a year and a half.  It would have been highly irregular to promote an attorney at that level of experience from a DCA I to a DCA III."  No evidence in the record identifies any employee who received a promotion from DCA-I to DCA-III.

The effective date of Majovski's promotion—July 1, 2018—became her new "salary anniversary date" (i.e., the date when she would automatically advance one step the next year).  Majovski emailed Peters, requesting to keep her original anniversary date of May 19 (about six weeks earlier) and to make her promotion retroactive to that date.  Majovski's email identified no reason for her request and made no reference to her gender.

Peters forwarded Majovski's email to Kapur and wrote: "Chutzpah. [¶] I am fine with giving her the extra 6 weeks of pay or not. I don't know the precedents." Kapur responded: "Yup there is a word for it. Let me look at it and get back to you and her."[4]

Soon after, Kapur rejected Majovski's request to keep her original salary anniversary date. Both in a contemporaneous email and at her deposition, Kapur explained that it was standard practice for the anniversary date to change upon promotion. No evidence in the record indicates otherwise.

**E.    In September 2018, Majovski's superiors made conflicting statements about whether she would be promoted to DCA-III if she transferred out of ELD. In November 2018, she voluntarily transferred from ELD to LAWA. She was not promoted.**

In early September 2018, Majovski successfully applied to transfer from ELD to the Los Angeles World Airports Division (LAWA). On September 9, 2018, before the transfer took effect, ELD supervisor Peters told Majovski, in the presence of ELD attorney Doug Lyon, that she would be promoted to DCA-III (at an unspecified time) regardless of whether she transferred to LAWA or remained in ELD. Outside Majovski's presence, Lyon protested that Peters should not have made that statement to

---

[4] Kapur testified: "I read [Peters's 'Chutzpah' remark] to say that she's asking for a lot; and my response is, Yup, she is." "I think that . . . we gave her a promotion, which we did outside the normal [PRP] process, in recognition of both the concern she raised and the good work that she had done and that that [promotion] should have been accepted as was."

Majovski "because it would take away the incentive for her to remain" in ELD.

On September 14, 2018, after discussion with Kapur, Peters told Majovski that "she would only be promoted to DCA III if she remained in the Employment Litigation Division."

Soon after, Majovski met with Chief Assistant City Attorney Jim Clark in his office, complained about Peters conditioning a promotion on her remaining in ELD, and expressed a belief that she and Susan Rim were underpaid. Clark expressed disapproval of Peters's statement and said that she would be promoted to DCA-III (at an unspecified time) regardless of whether she transferred to LAWA.[5]

Majovski chose to proceed with her transfer to LAWA, which took effect on November 19, 2018. Her classification and step did not change. In July 2019, she automatically advanced to DCA-II, step 8, raising her annual salary to $127,033.92.

## F. In October 2019, Majovski unsuccessfully applied for a promotion through a PRP. Female attorneys received promotions through the PRP at a higher rate than male attorneys.

In October 2019, City Attorney Mike Feuer circulated an office-wide memorandum announcing a PRP, through which all attorneys in the office could apply for promotions and/or step

---

[5] Majovski testified that during their September 2018 meeting, Clark said "something to the effect of . . . my door is always open and if it's closed it means . . . I'm looking at pornography, or I might be looking at pornography." On appeal, Majovski mentions Clark's alleged remark only in her opening brief's statement of facts. She does not argue that the remark supports any of her claims.

advancements.  The memorandum did not specify how many promotions or step advancements were available; instead, it stated that promotions or step advancements were "subject to the availability of funds and corresponding level of authorized positions."  It further stated:  "[T]he number of attorneys in our office who excel far exceeds the available budget and limited number of authorized positions approved by the Mayor and Council.  Therefore, the level of recognition that current financial resources allow will once again be modest."

The PRP memorandum set forth a five-step review process.  At the first three steps, an immediate supervisor, division or section supervisor, and branch chief each would "review an applicant" by assigning a rating of "not recommend," "recommend," or (at the first two steps only) "highly recommend."  At the fourth step, Chief of Staff Kapur, along with two other members of the office's executive management team, would review all applications and recommendations office-wide, and "forward a list of recommended candidates" to City Attorney Feuer.  At the fifth step, Feuer would make the final decisions.  Kapur testified that Feuer always followed the promotion recommendations made by Kapur and her fellow members of executive management.  The record contains no contrary evidence.

The PRP memorandum stated:  "The criteria that will be considered in reviewing applicants include: • Quality of work • Productivity • Workload • Flexibility/varied expertise • Specialized expertise • Relative performance • Overall contribution."  It did not state that these criteria were exclusive.  Kapur testified that in making her recommendations to the City Attorney, she considered office-wide goals that were not included

12

in the memorandum's list of criteria for reviewing applicants. Those goals included racial and ethnic diversity, as well as equitable distribution of promotions among the office's various branches and divisions.

It is undisputed that 364 attorneys (190 female, including Majovski, and 174 male) applied for a promotion and/or step advancement through the 2019 PRP; that 93 attorneys (50 female and 43 male) received a promotion or step advancement through the PRP; and that, as reflected in those figures, "26.3% of female applicants received a promotion or step increase, while 24.7% of male applicants received a promotion or step increase." In other words, female applicants were selected for recognition through the PRP at a slightly higher rate than male applicants.

Within LAWA, 13 attorneys (10 female, including Majovski, and three male) applied, and five (four female and one male) received promotions. Thus, 40 percent of LAWA's female applicants and 33 percent of its male applicants received promotions. The sole male applicant who received a promotion was Tim Dazé (Majovski's immediate supervisor), who advanced from DCA-IV to Assistant City Attorney. The four female applicants who received promotions advanced from DCA-III to DCA-IV.[6] Majovski was one of six LAWA applicants (four female and two male) who were highly recommended by their immediate

---

[6] Kapur declared that "most of the PRP promotions and pay raises were awarded to attorneys at the level of DCA III and above" because attorneys at those levels, unlike DCA-Is and DCA-IIs, could never receive automatic promotions under the MOU, even after they reached the highest step within their classification.

13

supervisors but received neither a promotion nor a step advancement.

In January 2020, Kapur sent Majovski a letter stating: "While we had many deserving applicants, unfortunately, the resources available to our Office are limited.  We simply were not able to recognize as many applicants as we would have liked and are not able to provide you with a merit-based promotion or step increase at this time."  Kapur testified that Majovski did not receive a promotion or step advancement because "we had many deserving applicants and limited resources" and "there were other applicants that were more or as qualified . . . as her."  Kapur identified several considerations that contributed to her decision not to recommend Majovski for recognition, including that Majovski received a promotion (from DCA-I to DCA-II) not long before, she had a relatively short tenure in the office, her division (LAWA) had received a fair number of promotions, and her promotion would "not necessarily" have contributed to the office's goals for racial and ethnic diversity.

**G.      In May 2020, due to a COVID-19 hiring and promotion freeze, LAWA's CFO decided not to fund a vacant DCA-III position.  Soon after, the City denied Majovski's request to be promoted into that position.**

In January 2020, Christina Checel, a DCA-III in LAWA, resigned from City employment.  Majovski assumed most of Checel's duties.

In March 2020, in response to the COVID-19 pandemic, then-Mayor Eric Garcetti ordered a "hiring and promotional freeze" in most City departments, excluding LAWA and certain other departments.  Garcetti ordered LAWA and the other

14

excluded departments "to review existing hiring plans, and react accordingly based on how the COVID-19 pandemic impacts their revenues."

Days later, LAWA's CFO, Tatiana Starostina, announced that no new positions would be approved for the upcoming fiscal year and that "no requests to fill current vacancies will be approved until further notice." Starostina declared: "LAWA's finances were seriously impacted by the onset of the COVID-19 pandemic in March 2020, as were the finances of the entire City. In particular, the sudden and substantial drop in air travel resulted in a dramatic loss of revenue for LAWA."

In May 2020, the City Attorney's Office requested an exception from the hiring and promotion freeze to backfill Checel's vacated DCA-III position. LAWA was responsible for funding the position. It is undisputed that later in May 2020, Starostina determined that LAWA would not fund the request to backfill the position "because of the LAWA hiring freeze."

In July 2020, Majovski automatically advanced to DCA-II, step 9, raising her annual salary to $134,133.12.

In August 2020, Majovski emailed Tim Dazé (her immediate supervisor) and Ray Ilgunas (Dazé's superior) to request a promotion into Checel's vacated DCA-III position. Dazé and Ilgunas agreed that they supported Majovski's request, but Ilgunas noted to Dazé that because the COVID-19 pandemic had "put all City finances in dire straits," the request was "inopportune and not likely to produce a favorable outcome." Ilgunas told Dazé that he would forward the request to Chief Assistant City Attorney Jim Clark; however, Clark retired one week later (without acting on the request) and was replaced by David Michaelson.

In September 2020, Majovski renewed her request to Dazé and Ilgunas. Ilgunas forwarded the request, with his and Dazé's support, to Michaelson and Kapur. Kapur responded that "promotions [we]re not realistic" at that time because the City had imposed a "very hard hiring and promotion freeze" subject only to "extremely limited" exceptions, and because in seeking such exceptions, the office's priority was hiring new employees to fill vacancies, not promoting existing employees. For those reasons, Kapur decided not to request an exception from the freeze to promote Majovski into Checel's vacated DCA-III position. As noted, Starostina (LAWA's CFO) had determined not to fund the backfilling of that position only four months earlier.

After Ilgunas relayed Kapur's response to Majovski, Majovski informed Ilgunas by email that she would no longer perform Checel's former duties because, among other reasons, she believed that "the Front Office" (office management) was "intentionally choosing not to adjust [her] pay for personal, retaliatory, and gender related reasons . . . ." Ilgunas forwarded Majovski's email to the City's Human Resources (HR) department.

HR investigator Denise Kattan investigated Majovski's internal complaint of discrimination and retaliation, including by interviewing Majovski, Dazé, Ilgunas, and Kapur. In May 2021, Kattan finalized an investigation report, which concluded that Kattan had found no evidence to support Majovski's complaint.

16

**H.** **In March 2021, Majovski filed the instant lawsuit. She subsequently received a discretionary step advancement and, through a second PRP, a promotion to DCA-III.**

In March 2021, Majovski filed the instant lawsuit against the City. Her operative complaint alleged that the City denied her parking benefits and a promotion to DCA-III because of her gender, and/or because of her complaints about perceived gender discrimination in pay. It contained causes of action for unequal pay based on gender in violation of the EPA, and for whistleblower retaliation in violation of Section 1102.5. It also contained four causes of action under FEHA: (1) gender discrimination; (2) discrimination based on association with other women; (3) retaliation; and (4) failure to prevent discrimination.[7]

In July 2021, Majovski automatically advanced to DCA-II, step 10, raising her annual salary to $137,828.88.

In August 2021, the City Council lifted the City's hiring and promotion freeze. About two weeks later, the City granted Majovski a discretionary step advancement to DCA-II, step 15 (the maximum step for a DCA-II), raising her salary to $157,831.92. It is undisputed that the City granted Majovski this step advancement "to bring her into pay parity with an individual with a similar experience level who was being brought into the Office at the time." No evidence in the record identifies that individual, or the individual's gender.

---

[7] Majovski voluntarily dismissed her seventh and final cause of action, for violation of Business and Professions Code section 17200 et seq.

17

In June 2022, through a new PRP, Majovski received a promotion to DCA-III, step 10, retroactive to May 9, 2022. The promotion raised Majovski's salary to $183,931.92.

## I. The trial court granted the City summary judgment.

In July 2023, the City filed a motion for summary judgment or, in the alternative, summary adjudication. Majovski opposed. Each party filed objections to certain evidence submitted by the opposing party.

After a hearing, the trial court overruled Majovski's objections, overruled 24 of the City's objections, and sustained the City's remaining 31 objections. The trial court granted the City's motion for summary judgment, concluding generally that the undisputed facts did not create triable issues as to whether Majovski was underpaid or otherwise subjected to an adverse employment action because of her gender or protected activity. Our Discussion summarizes the trial court's reasoning as to Majovski's separate causes of action.

After the trial court issued its order granting the City's motion for summary judgment, but before the court entered the judgment, Majovski filed a notice of appeal from the (forthcoming) judgment. On January 17, 2024, the trial court entered the judgment, and the clerk served Majovski with notice of entry thereof.

On March 20, 2024 (63 days after notice of entry of judgment), Majovski filed a second, untimely notice of appeal from the judgment, which this court assigned a separate case number (B337527). (Cal. Rules of Court, rule 8.104(a)(1) [notice of appeal must be filed within 60 days after notice of entry of

18

judgment].)  Majovski's two appeals from the judgment were not consolidated.

Before the record in either appeal was filed, Majovski filed an abandonment of appeal, on which she expressly indicated that she was abandoning appeal number B337527, filed on March 20, 2024—i.e., the second appeal.  The abandonment did not mention the instant appeal's case number or filing date.

## DISCUSSION

### A.     We deny the City's motion to dismiss the appeal.

The City moves to dismiss the instant appeal because Majovski filed her first notice of appeal before the trial court entered judgment, and because she abandoned her second, untimely appeal from the judgment.  For the reasons explained below, we deny the motion.

We exercise our discretion to treat Majovski's first notice of appeal from the judgment, which she prematurely filed before the judgment was entered (but after the trial court issued its order granting summary judgment), as if it had been timely filed immediately after the judgment's entry.  (Cal. Rules of Court, rule 8.104(d)(2); *Castillo v. Glenair, Inc.* (2018) 23 Cal.App.5th 262, 275, disapproved on another ground by *Grande v. Eisenhower Medical Center* (2022) 13 Cal.5th 313.)

The City urges us not to exercise our discretion in that manner, arguing that Majovski's abandonment of her second, untimely appeal prejudiced the City by giving its counsel the "impression" that Majovski did not intend to proceed with *any* appeal.  Acting on that mistaken impression of Majovski's intent,

19

the City's counsel directed a third-party vendor to delete a discovery database.

The City fails to show prejudice. Majovski's abandonment of appeal identified only the second appeal's case number and filing date. Because Majovski evinced no intent to abandon her first, timely appeal, it was unreasonable for the City's counsel to assume that no appeal would proceed. The City's counsel defends this assumption only by declaring: "It had escaped my notice or recollection that Ms. Majovski had filed two notices of appeal in this matter . . . ." We conclude that Majovski is not responsible for counsel's oversight, or for his resulting choice to direct the deletion of a discovery database.

The City also argues that Majovski's abandonment of the second appeal operates as an affirmance of the judgment and bars the instant appeal under the doctrine of res judicata. We disagree. The second notice of appeal was undisputedly untimely. (Cal. Rules of Court, rule 8.104(a)(1).) "A timely notice of appeal, as a general matter, is 'essential to appellate jurisdiction.'" (*People v. Mendez* (1999) 19 Cal.4th 1084, 1094.) "An untimely notice of appeal is 'wholly ineffectual: . . . the appellate court has no power to give relief, but must dismiss the appeal on motion or on its own motion.'" (*Ibid.*)

Thus, even if Majovski had not abandoned her untimely second appeal, we would have lacked jurisdiction in that appeal to affirm the judgment. We conclude that Majovski's abandonment of that appeal did not operate as an affirmance on the merits or otherwise give the judgment res judicata effect as to the instant appeal.

The cases on which the City relies did not address whether an initial appeal from a judgment was barred by the

20

abandonment of a subsequent, untimely appeal from the same judgment. (*Estate of Sapp* (2019) 36 Cal.App.5th 86; *Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001; *In re Marriage of Dade* (1991) 230 Cal.App.3d 621; *Hillman v. Stults* (1968) 263 Cal.App.2d 848; *Harsh v. Broad* (1961) 198 Cal.App.2d 128; *In re Oliver's Conservatorship* (1961) 192 Cal.App.2d 832.) "[C]ases are not authority for propositions not considered." (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1160.)

In short, we deny the City's motion to dismiss the appeal.

## B. Standard of review

We review a trial court's grant of summary judgment de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).)

A trial court properly grants a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.)

## C. Majovski forfeited her reply brief's challenge to the trial court's evidentiary rulings.

As Majovski acknowledges, in reviewing a summary judgment, appellate courts do not consider evidence "to which

21

objections have been made and sustained." (*Guz, supra*, 24 Cal.4th at p. 334.)  In her opening brief, Majovski nevertheless relies on evidence to which objections were made by the City and sustained by the trial court.

The opening brief does not argue that the trial court erred by excluding that evidence.  The City argues that Majovski therefore forfeited any challenge to the trial court's evidentiary rulings, and that we must disregard the excluded evidence.  In Majovski's reply brief, she argues for the first time that the trial court's evidentiary rulings were erroneous.

We conclude that Majovski forfeited her reply brief's challenge to the trial court's evidentiary rulings, for two reasons.  First, she forfeited the challenge by failing to raise the issue in her opening brief.  (*High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 111, fn. 2 (*High Sierra*) ["New arguments may not be raised for the first time in an appellant's reply brief"].)  " ' "Obvious considerations of fairness in argument demand that the appellant present all of [the appellant's] points in the opening brief.  To withhold a point until the closing brief would deprive the respondent of [an] opportunity to answer it or require the effort and delay of an additional brief by permission." ' " (*Ibid.*)

Second, Majovski forfeited her reply brief's evidentiary challenge by failing to support it with adequate citations and argument.  The pertinent subsections of her reply brief contain no citations to the record, to the Evidence Code, or to relevant case law.  Moreover, they do not discuss any specific evidentiary objection or ruling thereon.  " ' "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument

22

and citations to authority, we treat the point as [forfeited]." ' "[8] (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 721; see also *City of Riverside v. Horspool* (2014) 223 Cal.App.4th 670, 683-684 [appellant forfeited issue by citing only one, inapposite case].)

In sum, Majovski forfeited her reply brief's challenge to the trial court's evidentiary rulings. Thus, we disregard all evidence to which objections were made by the City and sustained by the trial court. (See *Guz*, *supra*, 24 Cal.4th at p. 334.)

## D. The trial court properly granted the City summary adjudication on Majovski's EPA claim.

The EPA provides that, subject to exceptions, "[a]n employer shall not pay any of its employees at wage rates less than the rates paid to employees of another sex for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions . . . ." (Lab. Code, § 1197.5, subd. (a).) "To establish her prima facie case, [a plaintiff must] show not only that she is paid lower wages than a male comparator for equal work, but that she has selected the proper comparator. '. . . [W]hen the challenged policy effects [*sic*] both male and female employees

_____

[8] Majovski's citation to *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243 is inapposite. In that case, a trial court erred by making a "blanket" ruling sustaining all but one of 764 evidentiary objections, including frivolous objections to the plaintiff's brief (which was not evidence) and to the plaintiff's identification of his own skin color, national origin, religion, and dates of employment. (*Id.* at pp. 255-256.) Here, the trial court's rulings, which sustained 31 of the City's 55 objections, bear no resemblance to the blanket ruling sustaining 763 of 764 objections in *Nazir*.

23

equally, there can be no EPA violation.  [Citation.]  [A plaintiff] cannot make a comparison of one classification composed of males and females with another classification of employees also composed of males and females.' "  (*Hall v. County of Los Angeles* (2007) 148 Cal.App.4th 318, 324-325 (*Hall*).)

"If that prima facie showing is made, the burden shifts to the employer to prove the disparity is permitted by one of the EPA's statutory exceptions . . . ."  (*Hall, supra*, 148 Cal.App.4th at pp. 323-324.)  The exceptions include a "seniority system," a "merit system," or a "bona fide factor other than sex, such as education, training, or experience."  (Lab. Code, § 1197.5, subd. (a)(1).)  "If an exception is established, the burden shifts back to the plaintiff to prove pretext."  (*Hall*, at p. 324.)

Here, in summarily adjudicating Majovski's EPA claim, the trial court reasoned that the City produced uncontradicted evidence that when Majovski transferred from WCD to ELD as a DCA-I, she "had been practicing law for less time than other DCAs ranked II and III at the ELD and that she had no employment litigation experience when she was hired, such that it was appropriate that she be labeled a DCA I."  "Plaintiff fails to identify male DCAs with fewer years of [experience] practicing law and fewer years of employment litigation experience who were classified or promoted to a higher step than female employees who had similar, or more experience practicing law and employment litigation.  Absent such evidence, Plaintiff cannot show a violation of the Equal Pay Act."

Regarding Majovski's tenure in LAWA, the trial court reasoned:  "Plaintiff also fails to present evidence that the 2019-2020 PRP promotion [process] was conducted in a discriminatory manner, where males with less experience were promoted at a

24

higher rate than females with more experience." "Defendants also present evidence that there was a hiring and promotion freeze at LAWA that prevented Plaintiff from being promoted to DCA III despite taking over the duties of the previous female DCA III." "Plaintiff fails to show that the 2020-2021 Fiscal Year hiring and promotion freeze was pretextual and was used to hire and promote male employees but not female employees." "After the hiring freeze was over, Plaintiff received further pay adjustments that eventually led her to having a classification of a DCA III."

On appeal, Majovski largely ignores the trial court's detailed analysis of her EPA claim. She argues that she produced evidence of a known pay gap between men and women in the City Attorney's Office, but cites only her separate statement, which cited an undated *draft* report on gender equity by former City Controller Ron Galperin. The trial court sustained the City's objections to the draft report on authentication grounds, among others. As discussed above, Majovski forfeited her reply brief's challenge to the trial court's evidentiary rulings. Thus, we disregard the draft report.[9]

---

[9] In addition to sustaining the City's objections to the former City Controller's draft report, the trial court discussed the report as follows: "While this [report] shows wage disparity amongst male and female City employees at large, it is not evidence of wage discrimination or violations of the Equal Pay Act existing at the City Attorney's Office between male attorneys and female attorneys. Plaintiff fails to show she was 'paid lower wages than a male comparator for equal work,' and that 'she has selected the proper comparator.' (*Hall v. County of Los Angeles* (2007) 148 Cal.App.4th 318, 324.)"

Next, Majovski argues that in granting her a discretionary step advancement in 2021, the City admitted that this adjustment to her salary was necessary to "achieve parity"— implying that the City acknowledged the existence of a *gender-based* pay disparity. However, the City acknowledged only that it granted Majovski the step advancement "to bring her into pay parity with an individual with a similar experience level who was being brought into the Office at the time." No evidence in the record identifies that individual's gender. As the trial court observed: "Plaintiff's evidence only shows that she received the salary adjustment, not that the adjustment was the result of Defendant trying to bring her pay to parity with a *male* employee of similar experience."

Finally, Majovski argues that she raised a triable issue regarding whether the City denied her parking at CHE (the workplace for ELD attorneys) because of her gender, by producing evidence that she and ELD attorney Doug Lyon saw George Sami, a male DCA-I, parking in CHE on multiple occasions. However, undisputed evidence established that Sami had an electric vehicle and Majovski did not. The Special Parking MOU granted electric vehicles priority for parking. As the trial court concluded, "[t]he fact that a male employee with a DCA I classification had an electric vehicle and was seen parking at CHE is not a material fact and is not evidence of an Equal Pay Act violation or discrimination based on gender."

Moreover, undisputed evidence established that the City provided parking to all female ELD employees who, unlike Majovski, had priority for parking because they were "Upper Management" (DCA-IIIs and above) or because they had seniority. Conversely, as the trial court observed, "Plaintiff fails

26

to rebut Defendant's evidence that hundreds of *male and female* DCAs were not afforded permanent parking in CHE. . . . That Plaintiff felt that it was unfair and unsafe that she had to park elsewhere is not evidence of discrimination because other DCAs also had to park offsite, *regardless* of whether they were male or female." (Italics added.) We conclude that no reasonable jury could find that the City denied Majovski parking because of her gender.

Majovski's opening brief does not attempt to compare her to any male employee other than Sami. In her reply brief, for the first time, she purports to identify three "similarly situated men" as "comparators," arguing: "Male attorneys Sha[u]n Dabby-Jacobs, Tim Dazé, and Nick Masero advanced rapidly from DCA II to DCA III despite experience and tenure comparable to or less than Majovski's." We conclude that Majovski forfeited that argument by failing to raise it in her opening brief. (See *High Sierra*, *supra*, 29 Cal.App.5th at p. 111, fn. 2.)

In any event, we conclude that Majovski's comparisons to Jacobs, Dazé, and Masero do not raise a triable issue of material fact as to her EPA claim. Undisputed evidence establishes that Jacobs is female. Indeed, Majovski's own declaration used female pronouns when referring to Jacobs. Because Jacobs and Majovski are of the same gender, Jacobs's alleged rapid advancement from DCA-II to DCA-III does not support an inference that Majovski was underpaid because of her gender.

As for male attorneys Dazé and Masero, Majovski cites no evidence supporting her assertion that they "advanced rapidly from DCA II to DCA III despite experience and tenure comparable to or less than Majovski's." It is undisputed that Masero had more than five years of experience in employment

litigation when the City hired him as a DCA-III in ELD in February 2020. Thus, as the trial court noted, "Masero had substantially more experience in litigation, and employment litigation in particular," than Majovski did during her tenure in ELD. Indeed, Majovski had no experience in employment litigation when she transferred to ELD in November 2016, and only two years of such experience when, in November 2018, she voluntarily transferred from ELD to LAWA.

At that time, Dazé (Majovski's immediate supervisor in LAWA) was already a DCA-IV. Majovski cites no evidence regarding Dazé's level of experience at that time or when, if ever, he previously advanced from DCA-II to DCA-III. We conclude that Majovski's comparisons to Masero and Dazé do not raise a triable issue as to whether she was underpaid because of her gender.

In short, we conclude that the trial court properly granted the City summary adjudication on Majovski's EPA claim.

E.    **The trial court properly granted the City summary adjudication on Majovski's Section 1102.5 claim.**

Section 1102.5 provides: "An employer . . . shall not retaliate against an employee for disclosing information . . . to a government or law enforcement agency . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation . . . ." (Lab. Code, § 1102.5, subd. (b).) "A report made by an employee of a government agency to their employer is a disclosure of information to a government or law enforcement

agency" within the meaning of this statute.  (*Id.*, § 1102.5, subd. (e).)

Causes of action under Section 1102.5 are subject to a two-step framework set forth in Labor Code section 1102.6.  (*Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 707 (*Lawson*).)  Under that framework, "[f]irst, it must be 'demonstrated by a preponderance of the evidence' that the employee's protected whistleblowing was a 'contributing factor' to an adverse employment action.  [Citation.]  Then, once the employee has made that necessary threshold showing, the employer bears 'the burden of proof to demonstrate by clear and convincing evidence' that the alleged adverse employment action would have occurred 'for legitimate, independent reasons' even if the employee had not engaged in protected whistleblowing activities."  (*Id.* at p. 712, quoting Lab. Code, § 1102.6.)  A contributing factor is one that tends to affect the outcome of the decision.  (See *Lawson*, at p. 714, citing *Rookaird v. BNSF Ry. Co.* (9th Cir. 2018) 908 F.3d 451, 461.)

Here, Majovski argues that she raised triable issues as to whether her "complaints regarding pay equity" were a contributing factor in adverse employment actions against her, including the City's denying her parking at CHE.  As discussed above, however, undisputed evidence shows that Majovski was not provided parking because she did not qualify for priority under the Special Parking MOU.  Moreover, Majovski was denied parking well *before* she first complained, in spring 2018, that she believed she and another female ELD attorney, Susan Rim, were underpaid.  We conclude that no reasonable jury could find that Majovski's protected activity was a contributing factor in the City's failure to provide her parking at CHE.

Majovski also argues that she suffered adverse employment actions on five occasions when the City failed to promote her to DCA-III: (1) in November 2016, when she transferred from WCD to ELD as a DCA-I; (2) in July 2018, when she received a discretionary promotion to DCA-II; (3) in November 2018, when she transferred from ELD to LAWA; (4) in January 2020, when she and 270 other applicants were not selected for a promotion through the 2019 PRP; and (5) in September 2020, during the City's COVID-19 hiring and promotion freeze, when she requested a promotion to backfill a DCA-III position vacated by Christina Checel.[10]

In summarily adjudicating Majovski's Section 1102.5 claim, the trial court concluded that Majovski failed to raise a triable issue as to whether she suffered an adverse employment action. However, the denial of a promotion is an adverse employment action. (E.g., *Kruitbosch v. Bakersfield Recovery Services, Inc.* (2025) 114 Cal.App.5th 200, 225 ["Beyond . . . refusing to promote the employee, adverse employment actions also include actions by the employer that are 'reasonably likely to impair a reasonable employee's . . . prospects for advancement or promotion' "], quoting *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1054-1055.) The City does not argue otherwise.

As an independent ground for summarily adjudicating the Section 1102.5 claim, the trial court concluded that "Plaintiff has no evidence of a causal connection between any complaints she

---

[10] Majovski claims to list *seven* separate instances when she was denied a promotion, but two of the listed instances are duplicative of the City's failure to promote her to DCA-III when promoting her to DCA-II instead, and of the City's failure to promote her into Checel's vacated position.

made and the promotions she sought."  The court reasoned: "Plaintiff was consistently promoted to the next pay classification after she complained about her own pay and Susan Rim's pay in 2018.  Plaintiff was promoted from DCA I to DCA II, effective July 1, 2018."  Shortly after Majovski spoke about a perceived gender-based pay gap with Chief Assistant City Attorney Jim Clark, "Plaintiff transferred to LAWA and received an anniversary pay step increase . . . on July 1, 2019."  "After she filed this lawsuit in March 2021, she received a non-MOU, non-PRP pay increase in August 2021 and was awarded a PRP promotion to DCA III and pay raise in June 2022."

The trial court further reasoned:  "Without evidence that Plaintiff was entitled to a pay adjustment to a DCA III [before June 2022] due to her years of practicing law and experience in employment litigation, she fails to show that the fact she was not promoted is evidence of retaliation.  Without such evidence, Plaintiff's belief that she was not promoted because she [complained she was underpaid because she] was female is 'mere speculation [that] cannot be regarded as substantial [evidence], and is insufficient to establish a triable issue of material fact.' " (Quoting *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163.)

We agree with the trial court that Majovski failed to raise a triable issue as to whether her protected activity was a contributing factor in the City's failure to promote her to DCA-III before June 2022.  We will address, in turn, each of the five instances when Majovski alleges she was unlawfully denied such a promotion.

31

### 1. 2016 transfer to ELD

As the trial court observed, the City produced uncontradicted evidence that when Majovski transferred to ELD as a DCA-I in November 2016, she "had been practicing law for less time than other DCAs ranked II and III at the ELD and that she had no employment litigation experience when she was hired, such that it was appropriate that she be labeled a DCA I."

On appeal, Majovski does not challenge that evidence. Instead, she argues that Chief Assistant City Attorney Thom Peters promised her that she would be promoted to DCA-III upon her transfer to ELD. She cites a portion of her declaration alleging that Peters made such a promise at that time. However, the trial court sustained the City's hearsay objection to that portion of her declaration. As discussed above, Majovski forfeited her reply brief's challenge to the trial court's evidentiary rulings. Thus, we disregard the excluded portion of Majovski's declaration. The other evidence she cites does not mention any promise that Majovski would be promoted.

Even assuming, arguendo, that Peters promised Majovski she would be promoted to DCA-III upon her transfer to ELD, his failure to fulfill that promise would not raise a triable issue of *material* fact as to her Section 1102.5 retaliation claim. In summarily adjudicating Majovski's EPA claim, the trial court observed: "Regardless of what Plaintiff was promised [by Peters] when she transferred to ELD . . . , it is undisputed that Peters did not have the authority to make Plaintiff a DCA II or III. Even if Peters' representations about making Plaintiff a DCA II or III were false, Plaintiff is not suing for misrepresentation but for violations of the Equal Pay Act and gender discrimination."

The same reasoning applies to Majovski's claim under Section 1102.5, which prohibits retaliation, not false promises— much less false promises made by an employee, like Peters, who had no independent authority to fulfill them. (Cf. *Guz, supra,* 24 Cal.4th at pp. 360-361 ["an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the [employer] lied about its reasons [for an adverse employment action]. The pertinent statutes do not prohibit lying, they prohibit discrimination"].)

Majovski also argues that Chief of Staff Leela Kapur, to whom Peters escalated Majovski's promotion request, acted on retaliatory animus in denying the request. She argues that Kapur revealed such animus when "Kapur rebuffed Majovski's 2016 complaints regarding unequal pay, citing concerns for what it 'may trigger in terms of me toos.' "

Majovski's argument misrepresents the record. At the time she transferred to ELD and requested a promotion to DCA-III, Majovski did not allege that she was underpaid because of her gender. Similarly, when Peters conveyed Majovski's request to Kapur, he did not claim that he or Majovski perceived any pay disparity based on gender. Instead, he expressed concern about an apparent disparity in expected future pay between an experienced female attorney hired from private practice and less experienced attorneys, including both Majovski and *male* DCA-I George Sami, whom the City initially hired at a lower classification.[11]

---

[11] Undisputed evidence indicated that Sami was admitted to the State Bar in December 2010 (three years before Majovski) and that he had over five years of experience practicing law when

In response to Peters, Kapur indicated that Majovski lacked sufficient experience to support a promotion at that time. Kapur suggested that Peters's concern about a disparity with experienced outside hires might be addressed by recommending step advancements (rather than promotions to a higher classification) for both Majovski and Sami, noting: "[W]e need to treat them similarly . . . ." Kapur added: "I can't say what that may trigger as far as 'me toos.' "

Thus, contrary to Majovski's characterization of the record, Kapur's comment about " 'me toos' " was not made in response to any complaint about perceived gender discrimination in pay. The comment concerned potential consequences of granting pay increases to both Majovski and a similarly situated male attorney who also remained a DCA-I because of his level of experience. We conclude no reasonable jury could find that Kapur's comment about " 'me toos,' " which she made *before* Majovski made complaints about perceived gender discrimination in pay, reflected bias against Majovski because of those complaints or because of her gender.

Majovski identifies no other evidence of retaliation in connection with the denial of her request to be promoted to DCA-III when she transferred to ELD. We conclude that she failed to raise a triable issue regarding whether her protected activity was a contributing factor in that denial.

---

he transferred to ELD as a DCA-I (the same classification as Majovski) in April 2016.

### 2. 2018 promotion to DCA-II

At an unspecified time in spring 2018, Majovski first complained that she and Susan Rim were subjected to perceived gender discrimination in pay, and requested that they both be promoted to DCA-III.[12]  Within months of that first complaint, in July 2018, the City promoted Majovski from DCA-I to DCA-II and Rim from DCA-II to DCA-III.

Kapur declared that Majovski was promoted only to DCA-II, not DCA-III, because it would have been "highly irregular" to grant a promotion to DCA-III to an attorney of Majovski's level of experience at that time, when she "had been practicing law for about four years and had been practicing as a civil litigator for about a year and a half."  Indeed, no evidence in the record identifies any employee—of any experience level—who received a promotion from DCA-I to DCA-III.

On appeal, Majovski does not identify any evidence that a similarly situated employee who did not engage in protected activity similar to hers received a promotion from DCA-I to DCA-III.  Instead, Majovski implies that Kapur acted on retaliatory bias in promoting her only to DCA-II rather than DCA-III.  Referring to a comment that Kapur made in connection with the promotion, she argues that Kapur "joked with Peters about Majovski's 'Chutzpah' (i.e., gall), in requesting basic equity in pay."

Again, Majovski's argument misrepresents the record. When Majovski was informed that the effective date of the July 2018 promotion would become her new "salary anniversary date"

---

[12] The City does not dispute that Majovski's spring 2018 complaint qualifies as a protected activity under Section 1102.5 and FEHA.

(i.e., the date when she would automatically advance one pay step the next year), she emailed Peters to request to make her promotion retroactive to her original anniversary date, about six weeks earlier. However, Majovski's email said nothing about pay equity—Majovski identified no reason for her request and made no reference to her gender. When Peters forwarded Majovski's email to Kapur, he commented "Chutzpah," before indicating that he neither supported nor opposed Majovski's request. In response to the "Chutzpah" remark, Kapur agreed: "Yup there is a word for it."

Soon after, Kapur rejected Majovski's request, based on the office's standard practice that a DCA's salary anniversary date changed when the DCA received a promotion. Majovski identifies no evidence contradicting Kapur's description of the office's standard practice.

Thus, contrary to Majovski's implication, Peters's "Chutzpah" remark was not made in response to any complaint about perceived gender discrimination in pay. Rather, it concerned Majovski's unexplained request, upon receiving a discretionary promotion, to keep her original salary anniversary date despite the promotion (contrary to standard practice). That request was not a report of a legal violation, and therefore was not a protected activity under Section 1102.5. (See Lab. Code, § 1102.5, subd. (b).) We conclude no reasonable jury could find that Kapur's agreement with Peters's "Chutzpah" remark reflected bias against Majovski based on her gender or protected activity.

Majovski identifies no other evidence of retaliation in connection with the denial of her request to be promoted to DCA-III when she was promoted to DCA-II instead. We conclude that

she failed to raise a triable issue regarding whether her protected activity was a contributing factor in that denial.

### 3. 2018 transfer to LAWA

In November 2018 (four months after her promotion to DCA-II), Majovski voluntarily transferred from ELD to LAWA. Before the transfer took effect, Peters initially told Majovski that she would be promoted to DCA-III (at an unspecified time) regardless of whether she transferred to LAWA or remained in ELD. However, after discussions with ELD attorney Doug Lyon and Kapur, Peters told Majovski that she would be promoted only if she remained in ELD. Chief Assistant City Attorney Jim Clark (who was between Peters and Kapur in the office hierarchy) then expressed disapproval of Peters's statement and told Majovski that she would be promoted to DCA-III (at an unspecified time) regardless of whether she transferred to LAWA.[13]

Majovski argues that the City's failure to promote her to DCA-III upon her transfer to LAWA was retaliatory because it breached Peters's initial promise, and Clark's subsequent promise, that she would receive such a promotion regardless of whether she transferred to LAWA. However, she identifies no

---

[13] Kapur testified that ELD faced "heightened" challenges in "recruitment and retention." Similarly, Lyon testified: "There's been a mass exodus [from ELD] over the years, every time that unit gets somebody, somebody else leaves. Sometimes you have three or four people leaving at the same time." Relatedly, Lyon testified that he encouraged Peters to incentivize Majovski to remain in ELD in part because other ELD attorneys had left or were leaving. Majovski acknowledged that Clark asked her what it would take to get her to stay in ELD, because ELD had lost a lot of attorneys.

evidence that Peters or Clark stated she would receive such a promotion immediately upon her transfer, or at any specific time thereafter. More importantly, for the same reasons discussed above with respect to Peters's similar alleged promise in 2016, Peters's and Clark's promotional promises—which they lacked independent authority to fulfill—do not raise a triable issue of *material* fact as to Majovski's claim under Section 1102.5, which does not prohibit false promises.

It is true that the evidence raises a reasonable inference that Majovski would have been promoted to DCA-III before June 2022 if she had remained in ELD and not transferred to LAWA. However, Majovski's voluntary transfer was not a protected activity under Section 1102.5, which prohibits retaliation only for reports of legal violations.[14] (Lab. Code, § 1102.5, subd. (b).) Thus, the inference that Majovski's promotion to DCA-III was delayed because she chose to transfer out of ELD does not raise a triable issue of material fact as to her retaliation claim.

### 4. 2019 PRP

In 2019, Majovski and 363 other attorneys applied for a promotion and/or step advancement through a PRP. Of these hundreds of applicants, 93 received a promotion or step advancement, while the remaining 271, including Majovski, did not.

---

[14] As discussed below, Majovski's FEHA retaliation claim fails for the same reasons as her Section 1102.5 retaliation claim. Majovski's voluntary transfer was not a protected activity under FEHA, which prohibits retaliation only for opposing practices forbidden under FEHA or participating in FEHA proceedings. (Gov. Code, § 12940, subd. (h).)

Kapur testified that City Attorney Feuer, the final decision maker in the PRP, selected the 93 successful applicants on Kapur's recommendation (which she made along with other members of the office's executive management). Kapur identified several considerations that contributed to her decision not to recommend Majovski for recognition, including that Majovski received a promotion (from DCA-I to DCA-II) not long before, and that her promotion would "not necessarily" have contributed to the office's goals for racial and ethnic diversity.[15]

Majovski argues that the City failed to produce admissible evidence as to why she did not receive a promotion in the PRP because "Kapur's subjective belief that other candidates were more appropriate for promotions cannot be imputed on decision-maker Feuer . . . ." However, Kapur testified that Feuer always followed her promotional recommendations. The record contains no contrary evidence. Kapur, not Feuer, signed the letter informing Majovski that she was not selected for a promotion through the PRP. We conclude that Kapur's testimony is competent evidence of the reasons for decision, and that the absence of direct evidence from Feuer (who left his elected office before the City filed its summary judgment motion in July 2023)

---

[15] Majovski's complaint did not allege racial or ethnic discrimination, and she did not request leave to amend the complaint to add such an allegation. Thus, racial and ethnic discrimination were beyond the scope of the issues before the trial court in ruling on the City's motion for summary judgment, and are beyond the scope of the issues before us on appeal. (See *Vulk v. State Farm General Insurance Company* (2021) 69 Cal.App.5th 243, 255-256; *Miller v. Department of Corrections & Rehabilitation* (2024) 105 Cal.App.5th 261, 286-287.)

does not support an inference that Majovski's protected activity was a contributing factor in the decision.

Majovski also argues that Kapur's consideration of the office's goals for racial and ethnic diversity creates a triable issue as to retaliation because such consideration violated the City's PRP policy. We disagree, for two reasons.

First, Majovski identifies no competent evidence that Kapur's consideration of racial or ethnic diversity violated the City's PRP policy. The PRP memorandum described a multi-step review process, beginning with three steps at which lower-level managers would review each applicant by assigning a specified rating, followed by a step at which executive management—including Kapur, the Chief of Staff—would forward to the City Attorney a list of applicants recommended for promotions. The memorandum specified criteria that would be considered "in reviewing applicants," but did not state that the specified criteria were exclusive—either in reviewing applicants or in making recommendations, like Kapur's, as to which applicants would receive promotions. Thus, the memorandum did not facially prohibit executive management from considering the City's goals for racial and ethnic diversity—or other criteria not specified in the memorandum—in recommending applicants for promotion.

Aside from the memorandum, Majovski cites only deposition testimony from David Villegas, an administrative coordinator in the office's HR Department. When shown the memorandum and asked if "[t]he scope of the criteria is listed here on this [memorandum] as [to] what should be considered," Villegas testified, "That's correct." When then asked if "there isn't supposed to be criteria based on someone's race or ethnicity as part of this PRP criteria," Villegas again testified, "Correct."

40

However, Villegas also testified that his role in the PRP process was limited to administering databases or application management systems, i.e., "managing the applications, making sure they were routed to the correct people, those sort of . . . administrative functions." He did not review applications or participate in discussions about applicants' qualifications. Absent evidence that Villegas had independent knowledge—beyond his reading of the PRP memorandum—of the City's policy governing the selection of PRP applicants for promotions, his opinion that consideration of racial or ethnic diversity would violate that policy lacked sufficient probative value to create a triable issue. (See *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 394 [plaintiff's opinion that her employer required on-call employees to remain within 30 minutes of their workplace had "no probative value absent a showing that the opinion [wa]s based on fact," and was not substantial evidence that such requirement existed].)

Second, even assuming, arguendo, that Kapur's consideration of racial and ethnic diversity violated the City's PRP policy, we conclude that the violation does not support a reasonable inference that Majovski's protected activity was a contributing factor in her non-selection for a promotion alongside 270 other unsuccessful applicants. Within LAWA alone, five other applicants were not selected for a promotion despite being "highly" recommended by their immediate supervisors, and two more were not selected despite being recommended. It is undisputed that Kapur was "unaware of any of the other LAWA attorneys who were not promoted via the PRP – other than Plaintiff – having made complaints about their pay (or any other complaint) to the City."

41

In the absence of any evidence that Kapur selectively considered diversity only in declining to recommend promotions for Majovski or other applicants who had engaged in similar protected activity, no reasonable jury could find that Kapur's consideration of diversity was a pretext for, or evidence of, retaliation against Majovski. (See *Diego v. City of Los Angeles* (2017) 15 Cal.App.5th 338, 359-360 (*Diego*) [even if police department violated its policy in denying off-duty work permits to Hispanic officers, violation did not support reasonable inference of race discrimination, where officers provided no evidence of race-based disparate treatment or other evidence suggesting reason for denial was their race]; *Slatkin v. University of Redlands* (2001) 88 Cal.App.4th 1147, 1159 [evidence that decision makers violated university procedures in denying plaintiff tenure did not create triable issue of material fact as to whether denial was motivated by plaintiff's religion]; *id.* at p. 1158 ["The fact that the University prohibited the use of 'collegiality' as a criterion for tenure does not turn covert reliance on it into evidence of discrimination"].)

### 5. 2020 hiring and promotion freeze

In March 2020, in response to financial consequences of the COVID-19 pandemic, the City—and LAWA in particular—instituted a hiring and promotion freeze. In May 2020, LAWA's CFO, Tatiana Starostina, determined that "because of the LAWA hiring freeze," LAWA would not fund a DCA-III position that had been vacated by Christina Checel, despite the City Attorney's Office request for an exception from the freeze. Four months later, in September 2020, Majovski asked to be promoted into Checel's vacant position, but Kapur decided not to (again) request

42

an exception from the freeze, because the office prioritized seeking such "extremely limited" exceptions to hire new employees, not to promote existing employees.

Majovski identifies no evidence that when Starostina decided not to fund Checel's vacant DCA-III position because of the LAWA hiring and promotion freeze, Starostina knew that Majovski was interested in the position or that Majovski had complained about perceived gender discrimination in pay. We conclude no reasonable jury could find that Majovski's protected activity was a contributing factor in Starostina's decision not to fund the position, which decision precluded Majovski's subsequent request to be promoted into the position.

Majovski did not allege in her complaint, and does not argue on appeal, that Kapur's decision not to request an exception from the hiring and promotion freeze—an exception that Starostina had already rejected—was an adverse employment action. Thus, Majovski forfeited that issue. (See *Vulk v. State Farm General Insurance Company*, *supra*, 69 Cal.App.5th at pp. 255-256; *Miller v. Department of Corrections & Rehabilitation*, *supra*, 105 Cal.App.5th at pp. 286-287.)

In any event, Majovski identifies no evidence that Kapur requested exceptions from the freeze to promote similarly situated employees who had not engaged in protected activity similar to Majovski's. Absent such evidence, a jury could only speculate that her protected activity was a contributing factor in Kapur's decision not to request an exception to promote her into Checel's vacant DCA-III position. "[S]peculation or conjecture . . . is insufficient to defeat summary judgment." (*Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 427 (*Arnold*); see also *Diego*, *supra*, 15 Cal.App.5th at pp. 355-356 [reversing jury verdict of

43

race discrimination, in part because plaintiff's testimony that his employer treated him differently because of his race was "simply speculation, or, at best, conclusions -- not competent evidence from which a jury could find discrimination"].)

In short, we conclude that the evidence in the record is insufficient to create a triable issue as to whether Majovksi's complaints of perceived gender discrimination in pay were a contributing factor in the City's failure to promote her to DCA-III (before it did so in June 2022). Accordingly, the trial court properly granted the City summary adjudication on Majovski's retaliation claim under Section 1102.5.

## F. The trial court properly granted the City summary adjudication on Majovski's FEHA claims.

### 1. FEHA principles

Under FEHA, a plaintiff bears the burden to prove that discrimination or retaliation was a "substantial" factor motivating an adverse employment action. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232; Cal. Code Regs., tit. 2, § 11009(c).) "A substantial factor motivating the denial of [an] employment benefit is a factor that a reasonable person would consider to have contributed to the denial. It must be more than a remote or trivial factor." (Cal. Code Regs., tit. 2, § 11009(c).)

"In analyzing claims of discrimination under FEHA, . . . California courts have long used the three-stage burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792

44

[(*McDonnell Douglas*)] . . . ."[16]  (*Arnold, supra*, 53 Cal.App.5th at p. 424.)  At the first stage of the *McDonnell Douglas* test, the plaintiff bears a burden, which is " ' "not onerous," ' " to establish a prima facie case.  (*Ibid.*)

At the second *McDonnel Douglas* stage, the employer bears a burden to produce " 'admissible evidence, sufficient to "raise[] a genuine issue of fact" and to "justify a judgment for the [employer]," that its action was taken for a legitimate, nondiscriminatory reason.' "  (*Arnold, supra*, 53 Cal.App.5th at p. 425, quoting *Guz, supra*, 24 Cal.4th at pp. 355-356.)  " 'This likewise is not an onerous burden [citation], and is generally met by presenting admissible evidence showing the defendant's reason for its employment decision [citation].' "  (*Arnold*, at p. 425.)  The defendant's reasons, "if nondiscriminatory, need not be wise or correct."  (*Ibid.*, citing *Guz*, at p. 358; accord, *Diego, supra*, 15 Cal.App.5th at pp. 343-344 ["alleged unfair treatment in the workplace does not amount to an actionable discrimination claim unless the treatment is based upon the employee's race or other protected status"].)

At the final stage of the *McDonnell Douglas* test, the plaintiff bears a burden " 'to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.' "  (*Arnold, supra*, 53 Cal.App.5th at p. 425, quoting *Guz, supra*, 24 Cal.4th at p. 356.)  Evidence raising only a weak suspicion of a discriminatory motive is insufficient to create a triable issue of material fact.  (See *Arnold*, at p. 428; *Guz*, at pp. 369-370.)

---

[16] The *McDonnell Douglas* test does not apply to Section 1102.5 claims.  (*Lawson, supra*, 12 Cal.5th at p. 712.)

The *McDonnell Douglas* test does not apply where a plaintiff produces direct evidence of discrimination. (*Lawson, supra*, 12 Cal.5th at p. 710.) Contrary to Majovski's contention, the evidence on which she relies is circumstantial. Thus, we will apply the *McDonnell Douglas* test to Majovski's FEHA claims, as the trial court did.

### 2. The trial court properly adjudicated Majovski's gender discrimination claims.

Majovski's complaint contained two gender discrimination claims under FEHA, the first claiming discrimination against Majovski based on her gender, and the second claiming discrimination against her based on her association with other women.[17] The trial court analyzed the two claims together. On appeal, Majovski likewise analyzes the claims together. We do the same.

The trial court concluded that the City met its burden at the second stage of the *McDonnell Douglas* test by producing evidence that it did not promote Majovski to DCA-III before June 2022 for a nondiscriminatory reason, i.e., her level of

---

[17] For purposes of FEHA's prohibition against discrimination on the basis of " 'sex' " and other protected characteristics, FEHA defines those characteristics to include a "perception that the person is associated with a person who has, or is perceived to have, any of those characteristics or any combination of those characteristics." (Gov. Code, § 12926, subd. (o).) " 'Sex' " includes gender. (*Id.*, § 12926, subd. (r)(2).)

experience.[18]  The trial court reasoned:  "Defendant asserts that evidence shows that Plaintiff was paid less than the more experienced male *and female* DCAs.  [Citation.]  Defendant argues that Plaintiff cannot show discrimination based on sex or gender because Plaintiff cannot show she was entitled to a higher pay adjustment of DCA II or III when she had less experience than DCAs II and III at ELD and LAWA, despite doing the same work.  Defendant also presents evidence that there were more women than men in higher DCA III and IV classification[s] and that female DCAs received more promotions than male DCAs during the relevant time.  [Citation.]  Thus, the burden shifts to Plaintiff to show discrimination based on sex or gender."  (Italics added and fn. omitted.)

On appeal, Majovski argues that the City failed to meet its second-stage burden because the City did not produce direct evidence from former City Attorney Mike Feuer, who was the ultimate authority over DCA promotions during the relevant timeframe, regarding *Feuer's* reasons for not promoting Majovski.  However, it is undisputed that LAWA's CFO, Tatiana Starostina, made the decision not to fund the backfilling of the DCA-III position vacated by Christina Checel—which decision precluded Majovski's request to promote into that position.  Further, as the City observes, uncontradicted evidence established that Feuer's Chief of Staff, Kapur, made the other challenged promotional

_____

[18] The City argues that Majovski failed to raise a triable issue regarding her prima facie case of gender discrimination at the first stage of the *McDonnell Douglas* test.  However, the trial court did not address Majovski's prima facie case.  Accordingly, we assume, arguendo, that triable issues of material fact exist as to her prima facie case.

47

decisions.  As discussed in our analysis of Majovski's Section 1102.5 claim, the City produced evidence from Starostina and Kapur regarding their nondiscriminatory and nonretaliatory reasons for those decisions.

It is true that in the 2019 PRP, Feuer made the *final* decision—on the recommendation of Kapur and other members of the office's executive management—to grant promotions or step advancements to 93 applicants, and to deny such recognition to Majovski and 270 other applicants.  However, as discussed, Kapur's uncontradicted testimony was that Feuer always followed her promotional recommendations.  Kapur, not Feuer, signed the letter informing Majovski that she was not selected for a promotion through the PRP.

We conclude that the City had no need to produce direct evidence from Feuer to meet its burden at the second stage of the *McDonnell Douglas* test.  That burden is not onerous and requires only admissible evidence sufficient to raise a genuine issue of fact that the City acted for a nondiscriminatory reason.  (*Arnold*, *supra*, 53 Cal.App.5th at p. 425.)  The trial court properly concluded that the City met its burden.

The trial court proceeded to conclude that Majovski failed to meet her resulting burden, at the final *McDonnell Douglas* stage, to raise a triable issue of material fact as to a discriminatory motive.  The court reasoned, in relevant part: "Plaintiff . . . fails to show instances of male employees having less experience than her, being promoted, or receiving a pay adjustment higher than Plaintiff."  "As Plaintiff fails to show that she was entitled to the salary adjustment to DCA II or III when she made the requests, that the PRP promotions were done in a discriminatory manner, or that she was paid less than male

48

counterparts with similar time practicing law and similar experience practicing employment litigation, Plaintiff's discrimination claim fails."

On appeal, in arguing that the City's nondiscriminatory reasons for not promoting her earlier were pretexts for gender discrimination, Majovski relies on the same evidence that she cites in support of her EPA and Section 1102.5 claims. For the same reasons we concluded that evidence did not create triable issues as to those claims, we conclude it did not raise triable issues as to her gender discrimination claims under FEHA.

Majovski also argues that the City's investigation of her internal complaint of discrimination is evidence of pretext because the investigator, Denise Kattan, granted Kapur editorial access to the draft investigation report before it was completed. Citing excerpts from Kattan's deposition testimony, Majovski implies that Kapur edited the report in an unspecified manner before it was finalized. However, the cited deposition excerpts do not mention Kapur or the investigation report.

The trial court observed: "Plaintiff . . . had the opportunity to depose Kapur over two days, but presented no evidence that Kapur substantively changed the final investigation report." "Plaintiff fails to show that Kattan's investigation was substantively or procedurally flawed," and "[w]ithout identifying what evidence Kattan [allegedly] failed to uncover, Plaintiff's assertion that Kattan's investigation was flawed and that discrimination based on sex and gender occurred remains speculative." We agree with the trial court that Kattan's investigation does not raise a triable issue of material fact as to whether the City's preceding failure to promote Majovski to DCA-III was substantially motivated by her gender.

49

Finally, Majovski argues that the City's alleged failure to investigate a misconduct complaint that she made against former City Council member Mitchell Englander is evidence of pretext. To support this argument, however, she cites only portions of her declaration to which objections were made by the City and sustained by the trial court. As discussed above, Majovski forfeited her reply brief's challenge to the trial court's evidentiary rulings. We therefore disregard the excluded evidence.

In sum, we conclude that the City met its burden at the second stage of the *McDonnell Douglas* test, and that Majovski failed to meet her resulting burden at the test's final stage. Thus, the trial court properly granted the City summary adjudication on her gender discrimination claims.

### 3. The trial court properly adjudicated Majovski's FEHA retaliation claim.

Majovski analyzes her FEHA retaliation claim together with her gender discrimination claims. She makes no distinct argument that the City's proffered reasons for not promoting her to DCA-III before June 2022 were pretexts for retaliation, as opposed to gender discrimination.

For the reasons we have explained regarding her gender discrimination claims under FEHA and her retaliation claim under Section 1102.5 (which Majovski based on the same protected activity), we conclude that Majovski failed to raise a triable issue of material fact as to her FEHA retaliation claim. Accordingly, the trial court properly granted the City summary adjudication on that claim.

50

### 4. Majovski's derivative failure-to-prevent claim fails with her underlying FEHA claims.

Majovski's fourth cause of action is for failure to prevent discrimination and retaliation in violation of Government Code section 12940, subdivision (k). "There is no stand-alone, private cause of action under Government Code section 12940(k). In order for a private claimant to establish an actionable claim under Government Code section 12940(k), the private claimant must also plead and prevail on the underlying claim of discrimination, harassment, or retaliation." (Cal. Code Regs., tit. 2, § 11023; see also *Department of Fair Employment & Housing v. M&N Financing Corp.* (2021) 69 Cal.App.5th 434, 444 ["in order to state a claim under section 12940, subdivision (k), a plaintiff must be able to prevail on an underlying claim of discrimination"].)

We have concluded that the trial court properly granted the City summary adjudication on Majovski's underlying claims of discrimination and retaliation. We therefore conclude that the court also properly granted the City summary adjudication on her derivative claim of failure to prevent discrimination and retaliation.

Having concluded that the trial court properly granted the City summary adjudication on all of Majovski's claims, we affirm the summary judgment for the City.

51

**DISPOSITION**

The City's motion to dismiss the appeal is denied.  The judgment is affirmed.  The parties shall bear their own costs on appeal.  (See *Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 950-951.)

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.